IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 9, 2014 Session

## LARRY D. WILLIAMS v. CITY OF BURNS

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Dickson County**
**No. 22CC-2008-CV-70     Robert E. Burch, Judge**

_____

**No. M2012-02423-SC-R11-CV  - Filed May 4, 2015**

_____

We granted permission to appeal in this case to address whether the evidence established that the plaintiff police officer was discharged solely in retaliation for conduct protected under the Tennessee Public Protection Act, Tennessee Code Annotated section 50-1-304, sometimes called the Whistleblower Act.  The chief of police for the defendant municipality had the plaintiff police officer "fix" a traffic ticket for a relative.  After the plaintiff officer complained to the mayor that the police chief had pressured him into illegal ticket fixing, the police chief discharged the plaintiff. The defendant municipality claimed that it terminated the officer's employment because he violated the chain of command by reporting the ticket fixing to the mayor, and also because he undermined the chief's authority with the other officers in the police department.  We hold that the municipality's assertion that it discharged the plaintiff for going outside of the chain of command amounts to an admission that it retaliated against the plaintiff for refusing to remain silent about illegal activities, conduct that is protected under the Tennessee Public Protection Act.  After a review of the record, we also hold that the evidence preponderates in favor of a finding that the second reason proffered by the municipality for the officer's discharge, that he undermined the police chief's authority, is pretext for retaliation.  Accordingly, we hold that the plaintiff was discharged solely in retaliation for conduct protected under the Public Protection Act.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Affirmed and Case Remanded to the Circuit Court for Dickson County**

HOLLY KIRBY, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK, GARY R. WADE, and JEFFREY S. BIVINS, JJ., joined.

Stephen W. Elliott and Fetlework Balite-Panelo, Nashville, Tennessee, for the defendant/appellant, City of Burns, Tennessee.

Phillip L. Davidson, Brentwood, Tennessee, for the plaintiff/appellee, Larry D. Williams.

Justin S. Gilbert, Jackson, Tennessee; Wade B. Cowan, Nashville, Tennessee; Jennifer B. Morton and Maha M. Ayesh, Knoxville, Tennessee; William B. Ryan and Bryce W. Ashby, Memphis, Tennessee; and Douglas B. Janney, III, Nashville, Tennessee, for the amicus curiae, Tennessee Employment Lawyers Association.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

By the time Plaintiff/Appellee Larry D. Williams ("Captain Williams") met Jerry D. Sumerour, Jr. ("Chief Sumerour"), Captain Williams had worked in law enforcement for a number of years in several smaller communities in Tennessee. When they met, Chief Sumerour was employed by the Police Department of the City of Burns, Tennessee ("the Department"), a small police department with just a few officers. The two men became friends. In 2007, Captain Williams began working for the Department as the captain detective. At all relevant times, Chief Sumerour was the Chief of Police for the Department, and Captain Williams was his second in command. Captain Williams and Chief Sumerour socialized together, and Captain Williams came to know Chief Sumerour's family.

On approximately March 20, 2008, Captain Williams drafted a memorandum for Chief Sumerour that set forth a new Department policy against "ticket fixing." The new policy stated that, once an officer in the field issues a traffic citation, the issuing officer is not permitted to cancel the ticket or convert it into a warning.[1] Chief Sumerour approved the new policy, and Captain Williams' memorandum was sent to all of the City's police officers.[2]

The next evening, Captain Williams was on duty. At around 10:00 p.m., he stopped

---

[1] As background, about two weeks before the new policy was issued, Captain Williams issued a traffic citation to a woman who worked with Chief Sumerour's wife. The Chief's wife called Captain Williams and asked him to convert the co-worker's traffic ticket into a warning, and Captain Williams did so.

[2] The memorandum stated that the new policy was intended to permit the Department's officers "to enforce the laws fairly and impartially regardless of who is kin to who[m] or who is a law enforcement officer. . . . This should remove stress from us when other officers and citizens come to us for help on an issued citation."

2

a vehicle traveling on Highway 47 at sixty-three miles per hour in a thirty-mile-per-hour speed zone.[3] The driver of the car, as it turned out, was Chief Sumerour's sixteen-year-old stepson, Cody. Once Captain Williams realized who the driver was, he immediately called Chief Sumerour. The Chief and his wife—Cody's mother—lived close by, so both immediately came to the scene. As Captain Williams was writing Cody's traffic citations, Chief Sumerour's wife became upset and protested loudly that Chief Sumerour should not permit Captain Williams to give her son a ticket. Eventually, Chief Sumerour and his wife returned to their vehicle and left the scene. Captain Williams issued Cody two traffic citations, one for speeding and the other for reckless driving.[4]

Later that evening, Chief Sumerour called Captain Williams and asked him to come to the Chief's home and bring Cody's traffic citations with him. When Captain Williams arrived, Chief Sumerour walked out to his car. Citing pressure from his wife, Chief Sumerour asked Captain Williams to write "warning" on the traffic tickets and give the tickets to the Chief. Initially, Captain Williams refused, citing the new ticket-fixing policy and expressing concern that they both could lose their jobs for breaking the laws against ticket fixing. When Chief Sumerour persisted, Captain Williams took off his badge, placed it on the dashboard of the car, and asked if there would be repercussions if he refused. According to Chief Sumerour, he told Captain Williams that there would not be repercussions if he refused.[5] Captain Williams relented and wrote "warning" on both tickets and handed them to the Chief.

The next day, a Saturday, Captain Williams was scheduled to go to the Department at 2:30 p.m. to go on duty. Chief Sumerour called Captain Williams and asked him to come by his residence on his way to the Department and pick up the traffic citations. Captain Williams did so.

When he arrived at the station with the citations, Captain Williams noticed that the car belonging to the mayor for the City of Burns, Jeff Bishop ("Mayor Bishop"), was parked out front. When he went inside, Captain Williams sought out Mayor Bishop and complained to

---

[3] Captain Williams later said that the vehicle was initially traveling 40 miles per hour in the thirty-mile-per-hour speed zone and quickly accelerated to 63 miles per hour before Captain Williams stopped it.

[4] Captain Williams indicated that the entire incident with Cody and the Chief's wife was videotaped, but the videotape was not available for reasons that are not clear in the record.

[5] Captain Williams later testified that Chief Sumerour did not respond to his question, and that he felt pressure to give in to Chief Sumerour's request. Chief Sumerour claimed, however, that he explained to Captain Williams that he made the request, not as the Chief of the Police Department, but rather "as Cody's stepdad and as his [Captain Williams'] friend."

him that Chief Sumerour had pressured him into "fixing" his stepson's traffic citations by converting them into warnings. He told the Mayor that he had not wanted to alter Cody's traffic tickets but was afraid that Chief Sumerour would fire him if he refused. Mayor Bishop told Captain Williams that Chief Sumerour had briefed him on the situation early that morning, but the Mayor offered no further response. After meeting with the Mayor, Captain Williams erased the "warning" notation on the tickets and placed them in Chief Sumerour's box for them to be filed with the juvenile court as actual citations.[6]

Chief Sumerour said that, on Monday, he met with the Mayor, City Attorney Tim Potter, and an assistant district attorney about the incident. According to Chief Sumerour, they all advised him that both tickets should remain warnings, so the Chief wrote "warning" on the tickets a second time.

That same day, Captain Williams called Chief Sumerour and asked whether he had turned in Cody's traffic citations. Chief Sumerour responded "in a very firm tone and very unfriendly tone that they would remain warnings."

A few days later, on Thursday, March 27, 2008, Chief Sumerour informed Captain Williams that, by discussing the ticket-fixing incident with the Mayor, Captain Williams had violated the Department's rule on the chain of command. Chief Sumerour "wrote up" Captain Williams for this alleged infraction. He gave Captain Williams a copy of the police department's organizational chart, and underneath it he wrote: "Captain, I strongly suggest you learn this! No where [sic] do I see Mayor listed in *your* chain of command. If you go outside your chain of command again, you will be terminated."

Captain Williams went to Mayor Bishop's home to meet with him again. He told Mayor Bishop that Chief Sumerour had pressured him into altering the traffic citations, and that he believed that Chief Sumerour was "trying to get rid of [him] and fire [him] because of the tickets that were written." Mayor Bishop assured Captain Williams that he would not let that happen, and that he would have Chief Sumerour turn in the original traffic citations. After consulting with the City Attorney, Mayor Bishop contacted Chief Sumerour and told him that he had concluded that Cody's traffic tickets should not be warnings but should instead be turned in to the juvenile court as citations. Chief Sumerour told the Mayor that he disagreed.

Early the next morning, Mayor Bishop called Chief Sumerour and advised him that he had until noon that day to turn Cody's traffic tickets in to the juvenile court as citations.

---

[6] Although the record is somewhat unclear, we gather that a traffic citation for sixteen-year-old Cody would have to be filed in the juvenile court but that a warning would not.

If Chief Sumerour did not do so, the Mayor said, he would be suspended. An hour later, the Mayor contacted Chief Sumerour and enhanced the threatened punishment to termination of the Chief's employment. This prompted Chief Sumerour to summon Captain Williams to his office and direct him to reissue new traffic citations to Cody, identical to the original ones.[7] Captain Williams complied "under protest," and Chief Sumerour filed the new traffic citations in the juvenile court.

In the same time frame, Chief Sumerour issued Captain Williams a warning for not answering his department-issued cell phone while he was the on-call detective. Chief Sumerour also wrote up Captain Williams for violating a school-zone policy, but he later rescinded this write-up when it became evident that there had been no violation of the school-zone policy. Prior to the ticket-fixing incident, Chief Sumerour had never disciplined Captain Williams.

In an attempt to defuse the situation, Mayor Bishop asked Captain Williams to attend a meeting with the Mayor and Chief Sumerour. Captain Williams declined the Mayor's invitation, explaining that he felt that things between the Chief and him needed to "cool down" first. The Mayor did not insist that Captain Williams attend the meeting.

The meeting between the Mayor and Chief Sumerour took place on April 4, 2008, without Captain Williams present. Chief Sumerour would later claim that the Mayor told him in that meeting that Captain Williams refused to attend because he had lost respect for the Chief, did not trust the Chief, and thought the Chief "was a piece of crap[] and [] needed to be fired."

Shortly after that, Chief Sumerour was told that Captain Williams had been discussing the ticket-fixing incident with the other three police officers in the Department. Chief Sumerour decided to solicit written statements from all three officers. All three written statements indicated that Chief Sumerour had asked for a written account of their discussions with Captain Williams regarding the ticket-fixing incident.

Officer Ed Richardson said in his statement that Captain Williams spoke to him about "the situation," but "at no time did Captain Williams ever belittle or put down the Chief." Officer Stephen Sullivan's statement recalled that Captain Williams "went into some details concerning the law side of the stop and asked my opinion on the stop." According to Officer Sullivan, Captain Williams asked Officer Sullivan if he would step into Captain Williams'

---

[7] Chief Sumerour did not explain why he required the issuance of new traffic tickets instead of using the original ones. The original traffic citations were entered into evidence at the trial, as well as the re-issued citations.

5

position as captain if something were to happen to Chief Sumerour and Captain Williams were made police chief. Officer Sullivan's statement recited that Captain Williams commented that he "hoped that it didn't come to that."

Officer Tase Sturgill's statement recited conversations indicating that Captain Williams had a decidedly negative attitude toward Chief Sumerour. Officer Sturgill recounted in his statement that Captain Williams said that he "no longer had any respect for Chief Sumerour," that he could not "salvage any respect for Chief Sumerour," and "that he had told the mayor that he would fire Chief Sumerour" for his involvement in the ticket-fixing incident. Recalling discussions that purportedly took place prior to the incident, Officer Sturgill asserted that Captain Williams had "always" told him that Chief Sumerour "wanted to fire [him], but [Captain Williams] talked him out of it . . . ."

Soon after he obtained the officers' statements, Chief Sumerour arranged to meet with Mayor Bishop and City Attorney Potter to inform them that he had decided to terminate Captain Williams' employment. Chief Sumerour later recounted in a written statement that he explained to the Mayor and the City Attorney "the importance of [Chief Sumerour] not losing control of [his] department and how important it [is] to maintain the respect of [his] patrolmen." His decision, Chief Sumerour said, was based on "all the information gathered the last few days and the statements" of the other police officers. Chief Sumerour emphasized: "Capt. Williams' comments concerning me over the last few days can not and will not be tolerated. I can not have an employee trying to sabatoge [sic] the entire department." Chief Sumerour noted in the statement that Mayor Bishop and the City Attorney supported his decision.

On April 9, 2008, nineteen days after Captain Williams issued the traffic citations to Cody, Chief Sumerour terminated Captain Williams' employment. The reason Chief Sumerour gave for the termination was insubordination by violating the Department's chain-of-command rules and by undermining the Chief's authority with the other police officers.

On May 2, 2008, Captain Williams filed this lawsuit in the Circuit Court for Dickson County against the City of Burns, asserting a claim of retaliatory discharge pursuant to the Tennessee Public Protection Act ("TPPA"), Tennessee Code Annotated section 50-1-304. Captain Williams alleged in his complaint that the City wrongfully discharged him for "refusing to remain silent about the illegal actions of being forced to alter the citations issued to the Chief's stepson." He asserted that the termination of his employment was "for trumped up reasons in order to discredit him."

In October 2010, the trial court granted the City's motion for summary judgment. It held that Captain Williams had "failed to establish that the [City's] motivation for the

discharge of [Captain Williams] was based solely on [Captain Williams'] refusal to participate in, or remain silent about, the alleged illegal activity." Captain Williams appealed.

On appeal, the City argued that the facts surrounding the ticket-fixing incident did not amount to illegal activity, and that, therefore, Captain Williams could not prove "refusal to participate in or remain silent about [any] illegal activity." Williams v. City of Burns, No. M2010-02428-COA-R3-CV, 2012 WL 504511, at *3 (Tenn. Ct. App. Feb. 15), perm. app. denied (Tenn. May 21, 2012). The City also argued that Captain Williams "could not credibly argue that his termination was solely because of his refusal to alter the citations," and it insisted that Chief Sumerour fired Captain Williams for "violation of policy and procedure and insubordination, namely, going outside the chain of command, openly criticizing and disagreeing with a police superior, and openly refusing to attend a meeting arranged by the Mayor to discuss their issues." Id. at *5 (quoting City's argument). The Court of Appeals easily concluded that ticket fixing was an "illegal activity" within the meaning of the TPPA. Id. at *3 (citing Tenn. Code Ann. § 55-10-204(a), which makes it illegal to cancel or solicit cancellation of a ticket, and Tenn. Code Ann. § 39-16-402(a)(1), which makes it illegal for a public servant to use his official power in an unauthorized way to obtain a personal benefit or harm another). The court also held that there were genuine issues of material fact regarding whether Captain Williams refused to alter the tickets or remain silent about the ticket fixing and regarding the actual motivation behind Captain Williams' discharge. Consequently, it reversed the trial court's grant of summary judgment and remanded for further proceedings. Id. at *7.

On August 30, 2012, the trial court conducted a bench trial in the matter. Both Captain Williams and Chief Sumerour testified at trial, giving substantially similar accounts of the facts. Officer Sturgill also testified, essentially to the same effect as the written statement he had given to Chief Sumerour. Captain Williams denied talking to Officer Sturgill about the incident and added, "I would never have talked to him about the events between me and Chief Sumerour."[8] The Mayor did not testify, but parts of his deposition were read into evidence. Eighteen exhibits were entered into evidence at trial, including the written statements of the three officers in the Department that were obtained by Chief Sumerour before he terminated Captain Williams' employment.

At the conclusion of the proof, the trial court rendered an oral ruling in favor of the

---

[8] Captain Williams pointed out that, as the captain detective, he had twice reported Officer Sturgill to Chief Sumerour, in one instance for improperly using a taser and in the other instance for making sexually suggestive comments to a civilian. By the time of trial, Chief Sumerour was no longer employed by the Department, and Officer Sturgill had been promoted to Police Chief.

7

City. At the outset of its oral ruling, the trial court held that Captain Williams' lawsuit did not involve a refusal to remain silent:

> The plaintiff initially refused to participate in fixing the ticket, but later relented. But that's enough to bring it under the statute. There's no proof that he was required to be silent, asked to be silent, did remain silent, didn't remain silent. Seems to me there was a whole lot of talking about this. So the silence factor just does not apply. It's whether he refused to participate. And, again, he initially, the Court finds as a matter of fact, that he initially refused to participate.
>
> . . . .
>
> > Basically what we have is the quote, powers that be, the chief . . . testifying that there were a number of reasons for the plaintiff's termination, and the plaintiff insisting that that's all a subterfuge, that he was actually terminated for his refusal to participate in the illegal activity. As I've said before, silence really doesn't have anything to do with it.

Addressing the reasons for Captain Williams' discharge, the trial court found that one reason was Captain Williams' initial refusal to convert Cody's traffic citations into warnings: "I don't think there's any question . . . [that] the plaintiff's initial refusal to modify this ticket, fix this ticket, so to speak, was a factor in his discharge. . . . And it's even likely that this refusal began the investigation which ultimately led to his discharge." It commented that all of the discharge factors were "intricately interwoven." The trial court also found, however, that the proof established that Captain Williams had been disloyal to Chief Sumerour by "attempting to subvert the loyalty of his officers." It held:

> [T]he plaintiff was discharged for refusing to participate, but also for subverting the authority of the chief and the violation of the chain of command. All of these violations arose from the initial refusal. . . . [T]hey're all intertwined. But they are separate instances. And the chain of command may not have been sufficient for a legal termination, but the Court finds that it was an actual reason for termination, as I say, in addition to the disloyalty.

The trial court concluded, then, that the termination of Captain Williams' employment was not based *solely* on his refusal to participate in ticket fixing. As a result, the trial court ruled in favor of the City.

The trial court subsequently issued a written order, stating only that Captain Williams had "failed to establish under the [TPPA] that [the City's] motivation for the discharge of his

employment was based solely on his refusal to participate in the alleged illegal activity." The order did not incorporate the trial court's oral ruling, by reference or otherwise. Captain Williams appealed.

The Court of Appeals reversed. Williams v. City of Burns, No. M2012-02423-COA-R3-CV, 2013 WL 4068180, at \*6 (Tenn. Ct. App. Aug. 12, 2013). It first addressed the City's assertion that Captain Williams' employment was terminated based on violation of the chain of command. Id. at \*3-4. The Court of Appeals observed that requiring Captain Williams to report the illegal ticket fixing directly to Chief Sumerour, the person who had pressured him into the illegal conduct, was contrary to the intent of the TPPA to allow employees to report illegal activity and protect them when they do. Id. at \*3. It held that Captain Williams' act of disclosing the Chief's ticket fixing to the Mayor was protected by the TPPA, so the City's termination of the Captain's employment for violating the chain of command "cannot stand." Id. at \*4.

The Court of Appeals next addressed the trial court's finding that Chief Sumerour terminated Captain Williams' employment, in part, because he subverted the Chief's authority. It noted that Chief Sumerour had characterized this as "insubordination," which it defined as being "disobedient." Id. at \*6. It found that Captain Williams' comments about Chief Sumerour, as recounted in the written statements of the three other officers, did not constitute disobedience or defiance of the Chief's authority. Id. The Court of Appeals also "question[ed] [Chief] Sumerour's motives" and found that he was "simply not credible." Id. Consequently, it held that Chief Sumerour's assertion that he terminated the Captain's employment for insubordination had "no basis in fact and did not actually motivate" the termination, and it was instead a pretext for retaliation. Id. For this reason, the Court of Appeals reversed the trial court's decision, held in favor of Captain Williams, and remanded the case for a hearing on damages. Id. We granted the City's application for permission to appeal.

## ISSUES ON APPEAL

The City argues that the Court of Appeals erred in reversing the trial court's finding on causation. It contends that the trial court's holding reflected a credibility determination in favor of Chief Sumerour's testimony that he terminated Captain Williams' employment partly for conduct not protected under the TPPA, namely, Captain Williams' insubordination and his attempts to undermine the Chief's authority by "bad-mouthing" him to the other officers in the Department. The City notes that a trial court's factual finding based on credibility may be reversed on appeal only where the record contains clear and convincing evidence contrary to that finding, and it argues that the record in this case contains no such evidence. Therefore, the City argues, the Court of Appeals erred in reversing the trial court's

9

decision.

Because this case was tried before the trial court without a jury, we review the trial court's findings of fact de novo on the record, with a presumption that the trial court's findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); see Garrett v. City of Memphis, 327 S.W.3d 37, 40 (Tenn. Ct. App. 2010). This means that we may not disturb the trial court's findings unless we determine "that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." Nashville Ford Tractor, Inc. v. Great Am. Ins. Co., 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005). We review questions of law de novo, with no presumption of correctness. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 88 (Tenn. 2000); Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

## ANALYSIS

### Background

We begin our analysis with the doctrine of employment at will. "The employment-at-will doctrine is a bedrock of Tennessee common law." Franklin v. Swift Transp. Co., 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). Indeed, it "is the fundamental principle controlling the relationship between employers and employees." Mason v. Seaton, 942 S.W.2d 470, 474 (Tenn. 1997). Under that doctrine, employment for an indefinite period of time may be terminated by either the employer or the employee at any time, for any reason, or for no reason at all. See Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 26-27 (Tenn. 2012); Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 534-35 (Tenn. 2002). Stated another way: "The long standing rule in this State is that an employee-at-will may be discharged without breach of contract for good cause, bad cause or no cause at all, without being thereby guilty of legal wrong." Harney v. Meadowbrook Nursing Ctr., 784 S.W.2d 921, 922 (Tenn. 1990); see also Haynes v. Formac Stables, Inc., No. W2013-00535-SC-R11-CV, 2015 WL 1408917, at *2 (Tenn. Mar. 27, 2015). The employment-at-will doctrine "recognizes that employers need the freedom to make their own business judgments without interference from the courts." Mason, 942 S.W.2d at 474.

This traditional rule, however, is not absolute; some restrictions have been imposed on the right of the employer to discharge an employee. Guy, 79 S.W.3d at 535. Tennessee has recognized a common-law claim for retaliatory discharge where an employee is discharged in contravention of public policy. Chism v. Mid-South Milling Co., 762 S.W.2d 552, 556 (Tenn. 1988); see Clanton v. Cain-Sloan Co., 677 S.W.2d 441, 444-45 (Tenn. 1984) (recognizing a claim for retaliatory discharge when an employee was discharged for enforcing her rights under workers' compensation laws). Under the public-policy exception,

10

an at-will employee may not be discharged for taking an action that public policy encourages or for refusing to do something that is inconsistent with public policy, and an employee who is fired under these circumstances has a common-law tort claim against the former employer. "Retaliatory discharge is 'an important, but narrow, exception to the employment-at-will doctrine' applicable only in limited circumstances." VanCleave v. Reelfoot Bank, No. W2008-01559-COA-R3-CV, 2009 WL 3518211, at *3 (Tenn. Ct. App. Oct. 30, 2009) (quoting Franklin, 210 S.W.3d at 530 (citing Stein v. Davidson Hotel, 945 S.W.2d 714, 717 (Tenn. 1997); Chism, 762 S.W.2d at 556)).

The public-policy exception to the employment-at-will doctrine adopted in Chism afforded protection under the common law to employees who refuse to participate in illegal activities or remain silent about them. Chism, 762 S.W.2d at 555-57; see also Guy, 79 S.W.3d at 535; Mason, 942 S.W.2d at 474. "[T]he law of retaliatory discharge stems from Tennessee public policy that an employee should not be placed in the moral, ethical and legal dilemma of being forced to choose between reporting or participating in illegal activities and keeping his job." Franklin, 210 S.W.3d at 530.

In addition to recognizing a common-law claim of retaliatory discharge,[9] all fifty states have enacted legislation designed to encourage the reporting of wrongdoing by deterring retaliation against "whistleblowers," generally defined as "organization members . . . who disclose illegal, immoral, or illegitimate practices (including omissions) under the control of their employers, to persons or organizations who may be able to effect action."[10] Norman D. Bishara et al., The Mouth of Truth, 10 N.Y.U. J. L. & BUS. 37, 43, 52 (Fall 2013) (quoting Janet P. Near & Marcia P. Miceli, Organizational Dissidence: The Case of Whistle-Blowing, 4 J. Bus. Ethics 1, 2, 4 (1985)). Whistleblowing serves as "[a]n important source of information vital to honest government, the enforcement of laws, and the protection of the public health and safety." Id. at 39 (quoting Stephen M. Kohn & Michael D. Kohn, THE LABOR LAWYER'S GUIDE TO THE RIGHTS AND RESPONSIBILITIES OF EMPLOYEE WHISTLEBLOWERS 1 (1988)).

---

[9] Most states apply the public-policy exception to the employment-at-will doctrine to recognize a common-law retaliatory discharge claim for whistleblowers. Norman D. Bishara et al., The Mouth of Truth, 10 N.Y.U. J. L. & BUS. 37, 53-54 & n.81 (Fall 2013) (citing cases).

[10] While all states make it illegal to discharge an employee in retaliation for whistleblowing, "[t]here is little uniformity among the states regarding who is protected or what kind of whistleblowing activity is protected." Bishara, supra note 9, at 64. Many state whistleblower statutes limit the type of disclosure that is protected, designate the person to receive the disclosure of wrongdoing, or specify the type of whistleblower who may assert a claim. Id. at 78-79. For example, some states protect only public employees, and some mandate that the disclosure of illegal activity must be in writing. Id. at 64-65, 74.

The TPPA, Tennessee's whistleblower legislation, was enacted in 1990, two years after the Court's decision in Chism. See 1990 Tenn. Pub. Acts 771 (codified as amended Tenn. Code Ann. § 50-1-304 (2014)). The TPPA gave statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing. The TPPA essentially codified the common-law cause of action for retaliatory discharge articulated in Chism.[11] Franklin, 210 S.W.3d at 527.

While the TPPA is sometimes referred to as Tennessee's "Whistleblower Act," this informal name somewhat oversimplifies the Act, in that the TPPA "includes both (1) discharge in retaliation for refusing to *remain silent* about illegal activities, usually referred to as 'whistleblowing,' and (2) discharge in retaliation for refusing to *participate in* illegal activities. The claims are similar but distinct." VanCleave, 2009 WL 3518211, at *7 & n.3. As explained in VanCleave:

> For both types of retaliatory discharge, the plaintiff must show that he was employed by the defendant and that he was discharged. In a whistleblowing claim, the plaintiff must show that he refused to remain silent about his employer's illegal activities, and the requisite causal relationship between his refusal to remain silent and his discharge. In a refusal-to-participate claim, the plaintiff must show that he refused to participate in illegal activities and the requisite causal relationship between his refusal to participate and his discharge.

Id. at *8 (citation and footnotes omitted); see Webb v. Nashville Area Habitat for Humanity, Inc., 346 S.W.3d 422, 437-38 (Tenn. 2011); Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 27 (Tenn. 2011).

A statutory claim under the TPPA differs from the common-law claim for retaliatory discharge in two important respects. First, the common-law retaliatory discharge claim is

---

[11] Effective July 1, 2014, the TPPA was amended to specifically "abrogate[] and supersede[] the common law with respect to any claim that could have been brought under this section." Tenn. Code Ann. § 50-1-304(g) (2014). Accordingly, under the statute as amended, in cases in which the plaintiff alleges retaliatory discharge for refusing to participate in illegal activities or for refusing to remain silent about illegal activities, the TPPA is the exclusive basis for relief. This amendment did not, of course, affect claims for other types of retaliatory discharge. As the Court in Chism recognized, common-law claims for retaliatory discharge have been recognized in a variety of contexts. Chism, 762 S.W.2d at 555-56; see Crews v. Buckman Labs. Int'l, Inc., 78 S.W.3d 852, 862 (Tenn. 2002) (holding that in-house counsel may bring common-law action for retaliatory discharge when she was terminated for reporting that her employer's general counsel was engaged in the unauthorized practice of law because the public interest is served when in-house counsel complies with ethical and statutorily-mandated duties).

12

available only to private-sector employees, but the TPPA extends protection to public employees as well.[12] Second, under the common law, a plaintiff is required to show only that retaliation for the protected conduct was a "substantial factor" in the termination of his employment; in contrast, the TPPA requires the plaintiff to prove that retaliation for the protected conduct was the *sole* reason. See Guy, 79 S.W.3d at 537; Haynes, 2015 WL 1408917, at *2. "[T]he legislature has chosen to enact a stringent standard and set the bar high for recovery under a retaliatory discharge claim pursuant to the [TPPA]." Sykes, 343 S.W.3d at 28; see Darnall v. A+ Homecare, Inc., No. 01-A-01-9807-CV-0034, 1999 WL 346225, at *8 (Tenn. Ct. App. June 2, 1999) (Koch, J., concurring) ("The General Assembly's choice of the term 'solely' means that an employee can prevail with a Tenn. Code Ann. § 50-1-304 claim only if he or she can prove that his or her refusal to participate in or to remain silent about illegal activities was the only reason for the termination.").

As a public employee, Captain Williams' claim for retaliatory discharge is based only on the TPPA, not the common law. At the time Captain Williams' cause of action accrued, the TPPA provided:

> (b) No employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> . . . .
>
> (d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304 (Supp. 2009) (emphasis added). Overall, a claim under the TPPA includes four elements:

> (1) the plaintiff was an employee of the defendant;
>
> (2) the plaintiff refused to participate in or remain silent about illegal activity;
>
> (3) the defendant employer discharged or terminated the plaintiff's employment; and

---

[12] The common-law cause of action is not available to public employees in Tennessee because Tennessee's Legislature did not remove sovereign immunity for such actions. Guy, 79 S.W.3d at 537 (citing Williams v. Williamson County Bd. of Educ., 890 S.W.2d 788, 790 (Tenn. Ct. App. 1994)).

13

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

Sykes, 343 S.W.3d at 26-27 (citing Voss v. Shelter Mut. Ins. Co., 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997)). The first and third elements are not in dispute in this case. The City clearly disputes the fourth element—whether Chief Sumerour terminated Captain Williams solely because of Captain Williams' refusal to participate in or remain silent about the ticket-fixing activity. The second element, whether Captain Williams refused to participate in or remain silent about illegal activity, is only partly in dispute.[13] The City does not dispute the trial court's holding that Captain Williams "refused to participate" in the ticket fixing within the meaning of the TPPA, even though the proof showed that Captain Williams eventually relented and changed the traffic citations to warnings. The City maintains, however, that the trial court correctly held that the case does not involve a refusal to remain silent about illegal activities that is protected under the TPPA. Because Captain Williams asserted a claim based on both refusal to participate and refusal to remain silent, we will discuss the second element of Captain Williams' claim in the course of our analysis.

## Analytical Framework for Trial[14]

---

[13] As we have indicated, the Court of Appeals held in the first appeal that the ticket-fixing incident "constitutes an illegal activity within the meaning of Tennessee Code Annotated section 50-1-304(a)(3)." Williams v. City of Burns, No. M2010-02428-COA-R3-CV, 2012 WL 504511, at *3 (Tenn Ct. App. Feb. 15, 2012). From the City's appellate briefs and its comments at oral argument, it is unclear whether the City challenges this holding in this appeal. Regardless, we agree with the Court of Appeals' conclusion in the first appeal, that ticket fixing constitutes illegal activity under the TPPA. Id. (citing Tenn. Code Ann. §§ 55-10-204(a), 39-16-402(a)(1)(d)). To the extent that Forrest v. City of Ridgetop, No. M2002-01176-COA-R3-CV, 2003 WL 21954195 (Tenn. Ct. App. Aug. 15, 2003), is contrary to this holding, it is expressly overruled.

[14] If a retaliatory discharge case is tried on the merits and then appealed, the appellate court's review of the trial court's decision will often focus on whether the evidence was sufficient to prove particular elements of the TPPA or common-law claim. See, e.g., Voss v. Shelter Mut. Ins. Co., 958 S.W.2d 342, 345-46 (Tenn. Ct. App. 1997) (reversing judgment for plaintiff based on lack of evidence to support the elements of a TPPA claim); see also Newcomb v. Kohler, 222 S.W.3d 368, 389 (Tenn. Ct. App. 2006) (focusing on the elements of the common-law retaliatory discharge claim in determining whether a directed verdict should have been granted); Sasser v. Averitt Express, Inc., 839 S.W.2d 422, 426-27 (Tenn. Ct. App. 1992) (same). The McDonnell Douglas/Burdine framework may be discussed only peripherally by the appellate court in such cases, because the framework primarily orders the presentation of proof before and at trial and does not affect whether the plaintiff employee met the ultimate burden of proving unlawful retaliation. See Hysten v. Burlington No. Santa Fe Ry. Co., 530 F.3d 1260, 1270 (10th Cir. 2008); Gibson v. City of Louisville, 336 F.3d 511, 513 (6th Cir. 2003); Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 769 (7th Cir. 1994). In the instant case, however, we find it necessary to examine the trial court's application of the McDonnell Douglas/Burdine framework because the trial court's analysis went off course in the very first stage of the

14

At trial, the trial court was required to apply the familiar McDonnell Douglas/Burdine burden-shifting analysis to the parties' proof.[15] See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257-58 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). The McDonnell Douglas/Burdine analytical framework is "an allocation of the burden of production and an order for the presentation of proof." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). "The goal of this approach is to progressively sharpen the inquiry into the elusive factual question of [retaliation]." Wilson v. Rubin, 104 S.W.3d 39, 50 (Tenn. Ct. App. 2002) (citing Burdine, 450 U.S. at 255 n.8). In Gossett, this Court explained the McDonnell Douglas/Burdine framework:

> Pursuant to McDonnell Douglas, if an employee proves a prima facie case of . . . retaliation, the employee creates a rebuttable presumption that the employer unlawfully . . . retaliated against him or her. The burden of production shifts to the employer to articulate a legitimate and . . . nonretaliatory reason for the action. If the employer satisfies its burden, the presumption of . . . retaliation "drops from the case," which sets the stage for the factfinder to decide whether the adverse employment action was . . . retaliatory. The employee, however, "must . . . have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for [retaliation]."

analysis in its failure to properly identify the protected conduct at issue as part of Captain Williams' prima facie case. This error, right out of the starting gate, undermined the remainder of the trial court's analysis. As a result, our analysis in this appeal could not simply focus on the proof on particular elements of the claim; we necessarily used the McDonnell Douglas/Burdine framework in reviewing the trial court's decision.

[15] In 2011, the Legislature amended Section 50-1-304 to add subsection (g), which sets forth a statutory burden-shifting framework to be applied to all claims under the TPPA, both for summary judgment motions and for trial. 2011 Tenn. Pub. Acts ch. 461 (enacted, effective June 10, 2011). The statute was amended in response to this Court's decision in Gossett v. Tractor Supply Co., 320 S.W.3d 777, 785 (Tenn. 2010) (holding that "the McDonnell Douglas burden-shifting framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence" set out in Hannan v. Alltel Pub'g Co., 270 S.W.3d 1, 8-9 (Tenn. 2008)). In the second appeal in this case, following the trial, the Court of Appeals indicated that the statutory framework found in the amended TPPA applied at trial in this case. Williams, 2013 WL 4068180, at *2. This was error, because Captain Williams' claim arose well before the 2011 effective date of the amendment. However, because the analytical framework set forth in the amended TPPA is virtually indistinguishable from the McDonnell Douglas/Burdine approach, the Court of Appeals' error made no real difference in the analysis. We note that Gossett changed only the standard applicable to summary judgment motions, not the analytical framework to be applied at trial. Gossett, 320 S.W.3d at 785.

15

Gossett, 320 S.W.3d at 780-81 (citations omitted).  Despite the fact that "intermediate evidentiary burdens shift back and forth under this framework," the ultimate burden of persuading the trier of fact that the employer engaged in unlawful retaliation remains at all times on the plaintiff employee.[16]  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (citing Burdine, 450 U.S. at 253).

### Prima Facie Case

As the plaintiff employee, Captain Williams had the initial burden at trial of presenting evidence to establish a prima facie case of retaliatory discharge.[17]  The burden to establish a prima facie case is not onerous.  Lin v. Metro. Gov't of Nashville and Davidson Cty., No. M2008-00212-COA-R3-CV, 2008 WL 4613559, at *5 (Tenn. Ct. App. Oct. 10, 2008) (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)).  Similar to establishing a prima facie case for retaliation under the Tennessee Human Rights Act, a plaintiff who asserts a claim under the TPPA must demonstrate that he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the

---

[16] If a plaintiff submits direct evidence of discriminatory intent or retaliatory motive in a common-law retaliatory discharge case or in a case brought under other discrimination statutes, he may use the direct method of proof to establish his case instead of the McDonnell Douglas/Burdine burden-shifting framework. See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church, 733 F.3d 722, 727-28 (7th Cir. 2013) (involving federal discrimination statutes); Frye v. St. Thomas Heath Servs., 227 S.W.3d 595, 609-10 (Tenn. Ct. App. 2007) (involving state discrimination statutes); Wilson v. Rubin, 104 S.W.3d 39, 49 (Tenn. Ct. App. 2002) (involving state discrimination statutes).  "Direct evidence of discrimination consists of evidence of an employer's conduct or statements which, if believed, requires a conclusion that unlawful discrimination was a substantial motivating factor for the employer's actions."  Wilson, 104 S.W.3d at 49 (footnote omitted); see Frye, 227 S.W.3d at 609.  As we discuss in more detail infra, Captain Williams has submitted direct evidence that retaliation was one basis for the City's termination of Captain Williams' employment.  However, the standard of proof for causation under the TPPA differs from the standard for either common-law retaliatory discharge or other discrimination cases.  As we have indicated, to prove common-law retaliatory discharge, a plaintiff need only show that retaliation was a substantial motivating factor in his discharge.  Chism, 762 S.W.2d at 556.  In contrast, to prove his claim under the TPPA, Captain Williams must establish that retaliation was the City's *sole* motivation for discharging him.  See Tenn. Code Ann. § 50-1-304(4).  Therefore, even if direct evidence establishes that retaliation was a substantial motivating factor in Captain Williams' discharge, that does not end our inquiry.  In this case, apart from the direct evidence of retaliation submitted by Captain Williams, the City submitted proof of other non-retaliatory reasons for Captain Williams' discharge, and Captain Williams relies in part on indirect evidence to rebut the City's proof.  Consequently, the trial court was required to utilize the McDonnell Douglas/Burdine framework at trial, and our review of the case on appeal reflects that analytical framework as well.

[17] The requirement for the plaintiff to make out a prima facie case is an evidentiary standard, not a pleading requirement.  Wilson, 104 S.W.3d at 50 (citing Swierkiewicz v. Sorema, 534 U.S. 506, 510-11 (2000)).

16

defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge.  Allen v. McPhee, 240 S.W.3d 803, 820 (Tenn. 2007), abrogated on other grounds by Gossett v. Tractor Supply Co., 320 S.W.3d 777 (Tenn. 2010).

At trial, Captain Williams contended that Chief Sumerour discharged him (1) in retaliation for refusing to participate in an illegal activity, i.e., ticket fixing, and (2) in retaliation for refusing to remain silent about the illegal activity, or "whistleblowing." As noted above, these claims are "similar but distinct."  VanCleave, 2009 WL 3518211, at *7.

The trial court implicitly found that Captain Williams made out a prima facie case at trial.  It observed that Captain Williams initially refused to alter the traffic citations he issued to Chief Sumerour's stepson but eventually relented and converted the citations to warnings. The trial court held that Captain Williams' initial refusal to convert the citations to warnings was "enough to bring it under [the TPPA]."  Thus, it held that Captain Williams made out a prima facie case under the TPPA by showing that he refused to participate in the Chief's illegal ticket fixing, and that the requisite causal connection existed between his discharge and his refusal to participate.[18]

At this point in its analysis, however, the trial court went awry.  Addressing Captain Williams' "refusal to remain silent" claim in its oral ruling, the trial court stated: "There's no proof that he was required to be silent, asked to be silent, did remain silent, didn't remain silent. . . .  So the silence factor just does not apply.  It's whether he refused to participate." We gather from these comments that the trial court reasoned that, in order for Captain Williams' conduct to constitute protected refusal to remain silent under the TPPA, he first had to prove that he had been instructed by a City official to "remain silent" about the illegal ticket fixing.

The Court of Appeals reversed this holding, quoting the Mason Court's rejection of a similar argument:  "It is axiomatic that an employer who is engaged in illegal activity does not want that activity reported to those officials who are responsible for enforcing the law."  Williams, 2013 WL 4068180, at *3 (quoting Mason, 942 S.W.2d at 475).  The Court of Appeals commented that requiring a plaintiff to first prove that he had been instructed to remain silent "would be contrary to the clear intent of the statute for employees to report illegal activity and to be protected when they do so."  Id.; see Mason, 942 S.W.2d at 476 ("Remaining silent is the opposite of speaking out, and refusing to remain silent is the same as speaking out.  The clear meaning of the statute is that employees have the absolute right to speak out about illegal activities in their workplaces.").

_____

[18] The City did not appeal this holding, so we do not address it.

17

The Court of Appeals' analysis on this issue is spot on. It was clearly erroneous for the trial court to intimate in its holding that, in order to assert a claim based on refusal to remain silent, Captain Williams first needed to show that he had been *directed* to remain silent about the ticket fixing. See Mason, 942 S.W.3d at 476 ("This statute does not require a showing that the employer instructed the employee to refrain from reporting the illegal activity; consequently, lack of such evidence is not fatal to the cause of action."). The soundness of this reasoning is confirmed by the evidence in this case. The irate written warning Chief Sumerour immediately fired off to Captain Williams when he learned that the Captain had spoken to the Mayor about the ticket fixing shows that, even though Captain Williams was not explicitly told to remain silent about the Chief's illegal ticket fixing, the Chief clearly expected the Captain to keep quiet about it and was angry at Captain Williams for failing to do so.

Thus, in addition to the refusal to participate found by the trial court, we hold that Captain Williams made out a prima facie case by showing that he refused to remain silent about the Chief's illegal ticket fixing, and that there was a causal connection between his discharge and his refusal to remain silent.

**Proffered Non-Retaliatory Reason**

"Establishing a prima facie case of [retaliatory discharge] creates a rebuttable presumption that the employer unlawfully [retaliated] against the employee." Wilson, 104 S.W.3d at 50 (citing St. Mary's Honor Ctr., 509 U.S. at 506; Gonzalez v. El Dia, Inc., 304 F.3d 63, 68-69 (1st Cir. 2002)). Once Captain Williams presented evidence at trial establishing a prima facie case of retaliation, the burden shifted to the City to articulate a non-retaliatory reason for his discharge. Newcomb v. Kohler Co., 222 S.W.3d 368, 389 (Tenn. Ct. App. 2006) (citing Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993)); see also Allen, 240 S.W.3d at 820 (analyzing action brought pursuant to the Tennessee Human Rights Act).

The employer's burden of production at trial at this point is affected by the causation requirement for a TPPA retaliation claim, as opposed to the burden of proof for a common-law retaliation claim. As noted above, for a common-law retaliation claim, the plaintiff employee need only show that the unlawful retaliation was a "substantial factor" in the employment decision, while under the TPPA, the plaintiff must ultimately establish that retaliation is the "sole" reason for the termination of his employment. Consequently, the McDonnell Douglas/Burdine framework must be refined for a claim under the TPPA. In articulating a non-retaliatory reason for discharging the employee, the defendant employer in a TPPA case need not proffer evidence that unlawful retaliation was no part of its decision to terminate employment. Rather, the employer need only introduce admissible evidence showing that unlawful retaliation was not the *sole* cause of the employment action. Wilson,

18

104 S.W.3d at 50 (citing <u>Bauer v. Albemarle Corp.</u>, 169 F.3d 962, 966 (5th Cir. 1999)). That is, the employer must proffer evidence that, even if retaliation was *a* motivation for the discharge, there was at least one non-retaliatory reason as well.

The burden to submit evidence at trial of a non-retaliatory motive is one of production, not persuasion. <u>See</u> <u>Burrus v. United Telephone Co. of Kansas, Inc.</u>, 683 F.2d 339, 343 (10th Cir. 1982); <u>Womack v. Munson</u>, 619 F.2d 1292, 1296 (8th Cir. 1980); <u>see also</u> <u>Burdine</u>, 450 U.S. at 254 (noting that, at this point, the employer "need not persuade the court that it was actually motivated by the proffered [non-retaliatory] reasons"). Because retaliatory discharge is an exception to the employment-at-will doctrine, the employer's proffered non-retaliatory reason for discharging the employee need not be a sound one; it need only be a reason *other than* retaliation.[19] <u>Versa v. Policy Studies, Inc.</u>, 45 S.W.3d 575, 581 (Tenn. Ct. App. 2000).

In this case, the City sought to satisfy its burden of production by submitting the testimony of Chief Sumerour and his written account of events.[20] Chief Sumerour testified that he discharged Captain Williams for insubordination by "going around the chain of command, going to the mayor, and bad-mouthing me to the other officers." According to Chief Sumerour, the Mayor had said that Captain Williams told the Mayor that the Chief was "a piece of crap" who "needed to be fired." Chief Sumerour also maintained that at least one other police officer had claimed that Captain Williams commented that he had lost all respect for the Chief. Chief Sumerour took the position that he could not be an effective chief of police with Captain Williams "trying to [sabotage] the entire department."[21]

To corroborate Chief Sumerour's testimony, the City submitted the written statements of the other officers in the Department—Officers Sullivan, Richardson, and Sturgill. The City relied in particular on Officer Sturgill's assertion that Captain Williams had in the past

---

[19] As discussed below, however, the soundness or sufficiency of an employer's proffered non-retaliatory reason is considered in determining if it is pretext for retaliation.

[20] Prior to trial, the City also pointed to Captain Williams' alleged refusal to attend the meeting with Mayor Bishop and Chief Sumerour. The undisputed evidence at trial, however, showed that Captain Williams was asked to attend the meeting but was not required to do so.

[21] Chief Sumerour also testified that he later came to believe that the ticket-fixing incident occurred as part of an elaborate scheme by Captain Williams to get the Chief fired and then take his place as police chief. The Chief speculated that Captain Williams set things up to stop the Chief's stepson for speeding. He believed that Captain Williams knew that the Chief would ask him to change the stepson's speeding citations to warnings because "[k]nowing Captain Williams and the way he knows my wife, yeah, he knew it was going to happen." Captain Williams denied this allegation. Because Chief Sumerour said that he did not arrive at this belief until after Captain Williams filed his lawsuit, it is not probative of his motive for discharging Captain Williams.

told him that Chief Sumerour wanted to fire Officer Sturgill, but Captain Williams "talked him out of it."[22] The City also entered into evidence excerpts from Mayor Bishop's deposition testimony, in which the Mayor said that Chief Sumerour consulted with him before he discharged Captain Williams, and that the Mayor understood that the Chief discharged Captain Williams "for insubordination for not following [the chain-of-command] policy."[23] This evidence, the City argued, showed that Captain Williams' employment was terminated for disloyalty and insubordination, conduct not protected under the TPPA.

The trial court apparently determined that the City had proffered non-retaliatory reasons for Captain Williams' discharge, specifically, "disloyalty" and "subverting the authority of the chief and the violation of the chain of command." The trial court commented that these reasons for Captain Williams' discharge were "intricately interwoven" and "all intertwined" with Captain Williams' refusal to participate in the ticket fixing, but it also characterized them as "separate instances."

As noted above, the trial court erroneously held that Captain Williams' claim did not involve a refusal to remain silent about illegal ticket fixing. This crucial misstep at the outset of the analysis hindered the trial court's assessment of the City's evidence on its claimed non-retaliatory reasons. Specifically, after Chief Sumerour stated that his discharge of Captain Williams was motivated by the Captain's conversations with the Mayor, the City sought to cloak this motivation as a legitimate, non-retaliatory reason by re-fashioning it as "a violation of the chain of command" and "disloyalty." Because the trial court had mistakenly held that "the silence factor just does not apply," it failed to recognize the City's argument as sophistry.

As the evidence in this case demonstrates, "[i]mproperly applied, a chain-of-command policy will undermine fair employment policies." Fleming v Correctional Healthcare Solutions, Inc., 751 A.2d 1035, 1040 (N.J. 2000) (citing Gares v. Willingboro Township, 90 F.3d 720, 724 (3rd Cir. 1996) (describing municipality's chain-of-command procedure as trapping plaintiff between "the Scylla of enduring [a supervisor]'s offensive conduct and the Charybdis of possible termination for violating the chain-of-command rules" by reporting supervisor's conduct to higher authority)). "[T]o discipline an employee for going over the head of a supervisor allegedly involved in illegal . . . workplace activity undermines exactly

---

[22] As noted above, Captain Williams denied talking to Officer Sturgill about the situation with Chief Sumerour.

[23] None of the excerpts from Mayor Bishop's deposition entered into evidence corroborated Chief Sumerour's assertion that Captain Williams called the Chief "a piece of crap" or advised the Mayor to fire the Chief.

what the Legislature had in mind when it passed the Whistleblower Act."[24]  Id. at 1039. Thus, to satisfy its burden of proffering a non-retaliatory reason for Captain Williams' discharge, the City cannot rely on the Chief's assertion that Captain Williams violated the chain of command by speaking to the Mayor.  Indeed, the Chief's testimony on this point amounts to direct evidence of a retaliatory motive; it is effectively an admission by the City that it discharged Captain Williams in retaliation for engaging in protected conduct, namely, speaking to the Mayor about the Chief's illegal ticket fixing.

The City, however, also produced evidence of a non-retaliatory reason for discharging Captain Williams—that he undermined the Chief's authority within the Department by "bad-mouthing" the Chief to the Mayor and to other police officers.  We can infer that the trial court held that the City's evidence of such "bad-mouthing" satisfied its burden to produce evidence of a non-retaliatory reason for the discharge.  The record supports such a holding.[25] Chief Sumerour testified that the Mayor told him that Captain Williams said that the Chief should be fired.  Officer Sullivan indicated in his statement that Captain Williams asked him if he would step into Captain Williams' position as captain if something were to happen to Chief Sumerour and Captain Williams were made police chief.  Officer Sturgill asserted in his statement that, apparently prior to the ticket-fixing incident, Captain Williams told him that Chief Sumerour "wanted to fire [him], but he [Captain Williams] talked him out of it."

---

[24] The Fleming court added this caveat:  "This does not mean that an employer may not fire an employee, even a whistleblower, who is unreasonable in expressing his or her complaints."  Fleming, 751 A.2d at 1039 (citing as an example of unreasonable behavior a public employee who calls the governor repeatedly late at night to report wrongdoing in a state agency).

[25] Some of the "bad-mouthing" about which Chief Sumerour complained involved Captain Williams' comments about the ticket-fixing incident to his fellow officers. This Court recently held that recovery under common law retaliatory discharge and the TPPA "must be limited to situations in which an employee has exposed the wrongful conduct of the employer in furtherance of the public interest, which may require reporting to an outside agency."  Haynes, 2015 WL 1408917, at *6.  However, Tennessee courts have not addressed whether disclosures to co-workers about a superior's illegal activities are protected under the TPPA, and the TPPA does not specify to whom the disclosure of illegal activity must be made in order to be protected conduct.  See Mason, 942 S.W.2d at 476 ("The clear meaning of the statute is that employees have the absolute right to speak out about illegal activities in their workplaces."). Some courts have indicated that comments to co-workers might be protected under state or federal anti-retaliation statutes.  See, e.g., Calvit v. Minneapolis Pub. Schools, 122 F.3d 1112, 1119 (11th Cir. 1997) (indicating that disclosure of illegal activities made to a co-worker qualifies as a report to "an employer" under the Minnesota whistleblower statute); Bevill v. UAB Walker College, 62 F. Supp. 2d 1259, 1279 (N.D. Ala. 1999) (noting that the federal anti-retaliation statute "does not specify that opposition to an employment practice must be made to a supervisor, or any other particular party, to constitute protected activity," and that "[t]o whom opposition to employment discrimination is voiced is irrelevant when it is being voiced").  We need not address the issue in this case because Captain Williams does not contend that the statements he made to his fellow officers constituted conduct that is protected under the TPPA.

21

These comments attributed to Captain Williams are not protected under the TPPA. Chief Sumerour testified that, based on these comments, he believed that Captain Williams was attempting to sabotage him and the Department, and that he discharged the Captain so as to maintain control of the Department.

Thus, even though one of the City's proffered reasons for Captain Williams' discharge was effectively an admission of retaliatory motive, the City submitted admissible evidence of a non-retaliatory reason, thereby satisfying its burden of production. This rebutted the presumption that the City terminated Captain Williams *solely* for refusing to participate in or remain silent about illegal activity. It shifted the burden back to Captain Williams to demonstrate that the City's proffered non-retaliatory reason for discharging him was pretextual, and that retaliation was the sole reason for his discharge. See Wilson, 104 S.W.3d at 54.

**Pretext**

Once the employer proffers a non-retaliatory reason for the employee's discharge, "the employee must have a full and fair opportunity to demonstrate that the employer's proffered reasons are pretextual and that unlawful [retaliation] was the true reason for the challenged employment action." Wilson, 104 S.W.3d at 50 (citing Burdine, 450 U.S. at 256; Versa v. Policy Studies, Inc., 45 S.W.3d 575, 580 (Tenn. Ct. App. 2000)). At this stage in the analysis, "the McDonnell/Douglas burden-shifting framework falls away and the trier of fact [is] left to determine the ultimate question of [retaliation]." Gibson v. City of Louisville, 336 F.3d 511, 513 (6th Cir. 2003). "[I]n other words, the question becomes whether the plaintiff has established that it is more likely than not that the employer's proffered reason 'is mere pretext and thus a coverup' for the employer's true retaliatory motive." Barry v. U.S. Capitol Guide Bd., 636 F. Supp. 2d 95, 102-03 (U.S.D.C. 2009) (quoting Vickers v. Powell, 493 F.3d 186, 195 (D.C. Cir. 2007) (internal quotations omitted)). In evaluating the evidence, the trial court must look at all of the evidence, including evidence submitted by the plaintiff to establish his prima facie case. Burdine, 450 U.S. at 255 n.10. Circumstantial evidence is also considered. See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1331 (10th Cir. 1999). The trial court must take into account any evidence that exposes the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered explanation. Wilson, 104 S.W.3d at 50-51 (quoting Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002)). After doing so, it must decide whether the evidence as a whole gives rise to an inference that the employer's proffered non-retaliatory reason is pretextual. See Phillips v. Anderson Cnty., No. E2009-01883-COA-R3-CV, 2010 WL 4514886, at *6 (Tenn. Ct. App. Nov. 10, 2010) (reasoning that causation must be determined by giving "careful consideration of the entirety of the evidence of the circumstances surrounding the employer's action in light of the

22

employee's [protected conduct]"); see also Washington v. Davis, 426 U.S. 229, 242 (1976); Stern v. Trustees of Columbia Univ., 131 F.3d 305, 314 (2d Cir. 1997).

> In Versa v. Policy Studies, Inc., the Court explained the concept of pretext: The question is not whether the employer's decision was sound, but whether the employer's asserted reason for the adverse employment decision is pretextual. The reasonableness of an employer's decision may be considered, but only so far as it "illuminates the employer's motivations." "The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext."

Versa, 45 S.W.3d at 581 (quoting In re Lewis, 845 F.2d 624, 633 (6th Cir. 1988)). In short, the plaintiff must show that the employer lied about the reason it gave for terminating the plaintiff's employment, in order to mask its true retaliatory motive. Id. at 583.

Pretext is typically shown in one of three ways: (1) by establishing that the employer's proffered reasons have no basis in fact, (2) by establishing that the proffered reasons did not actually motivate the discharge, or (3) by establishing that they were insufficient to motivate the discharge. See Wilson, 104 S.W.3d at 51; Versa, 45 S.W.3d at 581. The first is accomplished by showing that the proffered reason is based on facts that are not true; this calls into question the reasonableness of the employer's decision to discharge. Regarding the second Versa method of establishing pretext—showing that the proffered non-retaliatory reason did not actually motivate the discharge—a plaintiff may either produce evidence that the adverse employment decision was more likely motivated by retaliation or "show that the employer's explanation is not credible." Versa, 45 S.W.3d at 581 (citing Kline v. Tennessee Valley Auth., 128 F.3d 337, 342-43 (6th Cir. 1997)). Lastly, to show that the proffered reason is insufficient to motivate the discharge, the employee must produce evidence that other employees who engaged in substantially the same non-protected conduct were not fired. Id.

We now turn to the trial court's findings in this case. The trial court's written order sets forth only its ultimate conclusion; it contains no underlying factual findings on pretext or any other issue, and it does not incorporate the oral ruling. "It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders."[26] Anil

---

[26] For this reason, appellate courts often remand cases for additional fact finding when meaningful review is rendered impossible by the trial court's failure to identify in its written order the facts on which its ruling was based. See, e.g., Anil Constr. Inc. v. McCollum, No. W2013-01447-COA-R3-CV, 2014 WL 3928726, at *9 (Tenn. Ct. App. Aug. 7, 2014); Turner v. Gaviria, No. W2013-01944-COA-R3-CV, 2014 WL

23

Constr. Inc. v. McCollum, No. W2013-01447-COA-R3-CV, 2014 WL 3928726, at *8 (Tenn. Ct. App. Aug. 7, 2014) (citing Conservatorship of Alexander v. JB Ptnrs., 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011); Palmer v. Palmer, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977)); see Turner v. Gaviria, No. W2013-01944-COA-R3-CV, 2014 WL 426663, at *2 (Tenn. Ct. App. Feb. 3, 2014).

Nevertheless, we have recognized that a trial court's order "should be construed with reference to the issues it was meant to decide, and should be interpreted in light of the context in which it was entered."[27] Morgan Keegan v. Smythe, 401 S.W.3d 595, 608 (Tenn. 2013) (citations omitted); see also State v. Byington, 284 S.W.3d 220, 223 (Tenn. 2009) (ordering supplementation of the record with an order denying the motion for new trial because the transcript of the hearing on the motion for new trial clearly showed that the trial court denied the motion, although no written order denying it was filed). In this case, even if the trial court's written order is considered in light of its oral ruling, the oral ruling reveals only slightly more than the written order. The trial court stated in its oral ruling that Chief Sumerour's reasons for terminating Captain Williams' employment included "disloyalty" and "subverting the authority of the chief and the violation of the chain of command," but it added that these reasons were "intricately interwoven" and "intertwined" with Captain Williams' refusal to participate in the ticket fixing. The trial court did not make a specific finding on pretext. However, it stated in its oral ruling that Captain Williams' "disloyalty" was an "actual reason for termination." We discern from this statement and from the trial court's ultimate conclusion that it held that the City's proffered non-retaliatory reason for discharging Williams was not pretextual.

The trial court's conclusion, however, rested on a faulty premise, a fundamental misunderstanding of the entirety of the protected conduct at issue. As noted above, the trial court erroneously held that Captain Williams had failed to carry his burden under the "failure to remain silent" prong of the TPPA because it did not realize that the City's proffered chain-of-command justification for discharging Williams was essentially an admission of retaliatory motive. This left the trial court unable to sort out which of the City's stated reasons were retaliatory and which were non-retaliatory and, consequently, unable to properly evaluate the evidence on pretext.

426663, at *2 (Tenn. Ct. App. Feb. 3, 2014).

[27] As can be seen, we have attempted to glean from the trial court's written order any implicit findings it made. However, we can afford no presumption of correctness to factual findings that were simply not made at all. See Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997) ("When the trial judge has failed to make specific findings of fact, this Court will review the record to determine the preponderance of the evidence."); see also Cumberland Bank v. G & S Implement Co., 211 S.W.3d 223, 227-28 (Tenn. Ct. App. 2006); Parks Props. v. Maury County, 70 S.W.3d 735, 741 (Tenn. Ct. App. 2001).

The City argues vigorously that the trial court's ultimate holding was based on implicit determinations of the witnesses' credibility, and emphasizes that assessing the witnesses' credibility is a function that belongs uniquely to the trial judge who was present and saw them testify. We agree that we are required to defer to the trial court's credibility findings, including those that are implicit in its holdings. Richards v. Liberty Mut. Ins. Co., 70 S.W.3d 729, 733-34 (Tenn. 2002); Wells v. Tenn. Bd. of Regents, 9 S.W.3d 779, 783-84 (Tenn. 1999); Seals v. England/Corsair Upholstery Mfg. Co., Inc., 984 S.W.2d 912, 915 (Tenn. 1999). However, in the unique posture of this case, any findings implicit in the trial court's ultimate conclusion are for naught because they were based on a misguided premise. Because the premise for the trial court's decision was erroneous, we cannot know whether the trial court would have made the same underlying findings had it realized that one of the City's claimed non-retaliatory reasons was in reality an admission of retaliatory motive.

Under these circumstances, we are left with little choice but to make an independent assessment of the relevant evidence to determine where the preponderance lies. See Practical Ventures, LLC v. Neely, No. W2013-00673-COA-R3-CV, 2014 WL 2809246, at *10-11 (Tenn. Ct. App. June 19, 2014) (noting that, where lower tribunal's decision was obviously based on erroneous legal premise of constructive discharge, the evidence must be assessed by the appellate court independently, without deference to the trial court's factual findings). Therefore, we turn to the evidence in the record related to motive and pretext.

The starting point for our review is, of course, Chief Sumerour's testimony. His testimony began with the assertion that he discharged Captain Williams, at least in part, because Captain Williams violated the chain of command by speaking to Mayor Bishop about the Chief's ticket fixing. We now recognize this as an admission by the City of retaliatory motive. The Chief acknowledged that he threatened—in writing—to fire Captain Williams if he "went around" the chain of command again. Captain Williams spoke to the Mayor a second time, which prompted the Mayor to order Chief Sumerour to turn in the stepson's traffic tickets as citations or risk termination of the Chief's employment. A short time later, Chief Sumerour discharged Captain Williams, as threatened.

The significance of the City's admission that it fired Captain Williams for engaging in protected conduct cannot be overstated. It constitutes direct evidence of retaliatory motive, that is, proof of motive on its face, without the need for inference. See Frye v. St. Thomas Heath Servs., 227 S.W.3d 595, 609 (Tenn. Ct. App. 2007); Wilson, 104 S.W.3d at 49. Such direct proof of subjective motive is "'usually impossible to obtain' in the employment-law context when the fact in issue is the employer's motivation for a particular employment decision." Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1000 n.8 (10th

Cir. 2011) (quoting Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 181 (2d Cir. 1992); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992)); see also U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); Guy, 79 S.W.3d at 534 ("Where . . . the claim is one alleging retaliatory discharge and the essential factor to be determined is the employer's motivation, direct evidence of that motivation is rarely within the plaintiff's possession."). "Direct evidence of discrimination consists of evidence of an employer's conduct or statements which, if believed, requires a conclusion that unlawful discrimination was a substantial motivating factor for the employer's actions." Wilson, 104 S.W.3d at 49 (footnote omitted).

In addition to this direct evidence, the record contains several types of circumstantial evidence that retaliation was the *sole* reason behind Captain Williams' discharge. First, prior to the ticket-fixing dispute, Captain Williams and Chief Sumerour were friends as well as colleagues; afterward, the tensions between Chief Sumerour and Captain Williams were so high that Captain Williams told the Mayor he felt Chief Sumerour was trying to fire him. Chief Sumerour's own accounts of the events, in both his written statements and his trial testimony, fairly bristle with hostility toward Captain Williams.

Second, prior to the ticket-fixing incident, Captain Williams was the Chief's second in command and had a pristine work record; Chief Sumerour had never before disciplined Captain Williams. Within a short period of time after the ticket-fixing disagreement, Chief Sumerour issued Captain Williams two write-ups and one warning. When an employee is subjected to heightened scrutiny soon after engaging in protected conduct, this is evidence of pretext. See Sykes, 343 S.W.3d at 29 (noting that "a pattern of workplace antagonism following a complaint" is circumstantial evidence of causation); Tingle v. Arbors at Hilliard, 692 F.3d 523, 531-32 (6th Cir. 2012) ("Intensified scrutiny in the wake of protected activity may support a claim of retaliation . . . ."); Hamilton v. Gen. Elec. Co., 556 F.3d 428, 435-36 (6th Cir. 2009) (reasoning that evidence of heightened scrutiny and temporal proximity are sufficient to establish a causal nexus in a retaliation case); Moore v. KUKA Welding Syst. & Robot Inc., 171 F.3d 1073, 1080 (6th Cir. 1999) (stating that more frequent disciplinary write ups and unwarranted criticism after protected activity is evidence of retaliation); Lee v. N.M. State Univ. Bd. of Regents, 102 F. Supp. 2d 1265, 1280 (D.N.M. 2000) ("Additional evidence of pretext is demonstrated by the heightened scrutiny and differential treatment to which Plaintiff was subjected.").

Third, Chief Sumerour approached each police officer in the Department and asked for a written statement on any conversations with Captain Williams about the ticket fixing.

26

The trial court in fact observed that the ticket-fixing dispute "began [Chief Sumerour's] investigation" of Captain Williams. Chief Sumerour's active solicitation of information about Captain Williams from the other officers is further evidence of the Chief's "heightened scrutiny" of the Captain, and indicates an effort by the Chief to obtain "ammunition" against him.[28] This, too, indicates retaliatory motive. See Upshaw v. Ford Motor Co., 576 F.3d 576, 588-89 (6th Cir. 2009) (noting that an employer's solicitation of information from other employees about the plaintiff can be construed as heightened scrutiny, which is evidence of retaliatory motive).

Fourth, Chief Sumerour discharged Captain Williams less than three weeks after the ticket-fixing incident. The close temporal proximity between Captain Williams' protected conduct and the discharge is also probative of a causal connection between the protected conduct and the discharge. See Sykes, 343 S.W.3d at 29 (indicating that "temporal proximity" is circumstantial evidence of causation); Allen, 240 S.W.3d at 823 (indicating that two weeks to two months between the protected conduct and the adverse employment action constituted "a close temporal proximity").

Against this backdrop, we consider the evidence supporting the City's claim that Chief Sumerour had a legitimate non-retaliatory motive for discharging Captain Williams. Officer Sullivan's statement indicated that Captain Williams talked about what might happen in the event Chief Sumerour were discharged over the ticket fixing, but Captain Williams hoped it would not come to that. Officer Sturgill claimed in his statement that Captain Williams made harsh remarks about Chief Sumerour concerning the ticket fixing, that he had no respect for the Chief, and that he had advised the Mayor to fire the Chief because of the illegal activity. The Mayor allegedly repeated to Chief Sumerour similar harsh comments allegedly made by Captain Williams. Chief Sumerour stated that his decision to discharge Captain Williams was based on the other officers' statements and his view of Captain Williams' conduct as an attempt to sabotage his authority as chief of police. All of this evidence is, as the trial court observed, "interwoven" with the protected conduct of refusing to remain silent about the Chief's illegal ticket fixing.[29]

_____

[28]Nevertheless, any "ammunition" obtained through heightened scrutiny must be evaluated. For example, had Chief Sumerour subjected Captain Williams to "heightened scrutiny" and uncovered serious misdeeds unrelated to the protected conduct, such as the Captain's involvement in embezzlement within the Department, a discharge of Captain Williams for embezzlement would less likely be seen as pretextual.

[29] The fact that the content of the officer statements solicited by Chief Sumerour alluded to discussions involving the illegal ticket fixing does not preclude the officers' statements from being the basis for a non-retaliatory reason for the discharge. However, when the claimed non-retaliatory reason is closely related to the plaintiff's protected conduct, it is more likely that the proffered non-retaliatory reason will be

27

The only evidence of untoward comments by Captain Williams unrelated to the Chief's ticket fixing is contained in Officer Sturgill's statement. Officer Sturgill asserted that Captain Williams purportedly told Officer Sturgill that Chief Sumerour "always" wanted to fire Officer Sturgill, but Captain Williams stood up for Officer Sturgill. Captain Williams denied the statements Officer Sturgill attributed to him, but for purposes of this appeal, we assume that Chief Sumerour actually believed Officer Sturgill's account.

As noted above, we look at the entirety of the evidence to determine whether it preponderates for or against a finding of pretext. See Newcomb, 222 S.W.3d at 390. The record contains powerful evidence to support a finding that Captain Williams' discharge was motivated by retaliation for his act of speaking with the Mayor about the Chief's illegal activity. Chief Sumerour's admissions, his open hostility toward Captain Williams, the heightened scrutiny and sudden increase in discipline of Captain Williams, the close temporal proximity between the protected conduct and the discharge, and the fact that most of the allegedly non-retaliatory reasons are closely related to the protected conduct all weigh heavily in favor of a finding of retaliatory motive. Juxtaposed against this overwhelming evidence of retaliatory motive, the City's evidence of a legitimate non-retaliatory reason for the discharge looks flimsy indeed. Considering the aggregate weight of the evidence in the record, we conclude that the evidence clearly preponderates in favor of a finding that the City's proffered non-retaliatory reasons for discharging Captain Williams are pretextual, and that the sole reason for Captain Williams' discharge was retaliation for his refusal to participate in and remain silent about the Chief's illegal activities. See Versa, 45 S.W.3d at 581 (noting that pretext can be shown by producing evidence that the discharge "was more likely motivated by discrimination" or that the proferred non-retaliatory reason "is not credible").

Accordingly, we hold that the evidence in the record as a whole preponderates in favor of a finding that Captain Williams was terminated solely in retaliation for refusing to participate in Chief Sumerour's ticket fixing and for refusing to remain silent about it. Therefore, we affirm the decision of the Court of Appeals and remand the cause to the trial court to enter a judgment on the merits in favor of Captain Williams, to conduct further proceedings on damages, and for any other proceedings that the trial court deems appropriate, consistent with this opinion.

viewed as pretextual.

## CONCLUSION

The decision of the Court of Appeals is affirmed, and the cause is remanded to the trial court for further proceedings. Costs on appeal are to be taxed to the City of Burns, Tennessee, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE