IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 16, 2018 Session

## WENDY STERLING WEINERT ET AL. v. CITY OF SEVIERVILLE, TENNESSEE

Appeal from the Chancery Court for Sevier County
No. 16-2-041    Telford E. Forgety, Jr., Chancellor

No. E2018-00479-COA-R3-CV

Wendy Sterling Weinert, a former City of Sevierville police officer, brought this retaliatory discharge action against her former employer pursuant to the Tennessee Public Protection Act (TPPA), Tenn. Code Ann. § 50-1-304 (Supp. 2018). She alleged that she was discharged solely because of her whistleblowing activities of reporting an alleged incident of excessive force and alleged sexual harassment by other officers. The trial court granted summary judgment, holding that plaintiff could not establish that her termination was solely caused because of her whistleblowing activities, as required by the TPPA. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Patrick L. Looper, Knoxville, Tennessee, for the appellants, Wendy Sterling Weinert and Matthew Walter Weinert.

Reid A. Spaulding and Dan R. Pilkington, Knoxville, Tennessee, for the appellee, City of Sevierville, Tennessee.

# OPINION

## I.

Plaintiff was hired as a patrol officer in mid-2008. She became a field training officer in September of 2013. She unsuccessfully applied for a promotion to the rank of Sergeant in 2014. Defendant awarded the promotion to plaintiff's fellow patrol officer, Rebecca Cowan. Subsequently, on September 24, 2014, plaintiff reported to Captain Matthew Ayers that she had been sexually harassed by two other officers. Capt. Ayers forwarded the information to Chief of Police Don Myers, and the City opened an investigation. Capt. Ayers testified that he believed the accused officers were not disciplined because of a lack of corroborating proof uncovered by the investigation. In November of 2014, plaintiff filed a complaint against defendant with the Equal Employment Opportunity Commission alleging sexual discrimination. The EEOC eventually dismissed the complaint, finding that it "is unable to conclude that the information obtained establishes violations of the statutes."

Shortly after plaintiff reported her harassment allegations to Capt. Ayers, she reported an incident to him that she had witnessed, which she alleged involved excessive force against an arrestee by two fellow police officers. In her deposition, plaintiff admitted that she did not report the incident until approximately eighteen months after it occurred. Capt. Ayers testified that he investigated plaintiff's allegation by pulling the arrest report, booking sheet, and use of force report. He also reviewed a videotape of the incident. From this investigation, Capt. Ayers concluded that "there was no basis for her complaint that there was excessive force used."

In June of 2014, plaintiff requested a shift change, which defendant granted. This resulted in her being under the supervision of Sgt. Cowan and Lt. David Finchum. Sgt. Cowan testified that she became aware of several incidents and complaints regarding plaintiff's work performance that caused her concern. These included issues of plaintiff avoiding dispatch calls, not backing up fellow officers, and handling calls and citizen interactions in an unsafe manner. The record contains a "disciplinary/counseling report" filed by Sgt. Cowan on June 13, 2015, documenting "safety violation[s]" and "policy violation[s]" and indicating that plaintiff received coaching and a "verbal warning."

Plaintiff returned to Capt. Ayers on June 29, 2015. She testified that at that meeting, "it was me telling him that I felt there was a witch hunt out for me." In essence, plaintiff took the position that Sgt. Cowan was unfairly singling her out for unwarranted disciplinary measures. That same day, Capt. Ayers called in Lt. Finchum and Sgt. Cowan to his office to discuss plaintiff's complaints. Sgt. Cowan expressed surprise and informed Capt. Ayers of plaintiff's job performance issues. Shortly thereafter, Sgt.

Cowan provided the captain with the documentation memorializing plaintiff's employment performance violations.

On July 1, 2015, plaintiff, Lt. Finchum, and Sgt. Cowan again met in Capt. Ayers' office. According to plaintiff's deposition testimony, the following happened:

> Captain Ayers had some papers on his desk turned upside down and he kept – he had his hands on. And then he said something like do you have anything to add to what you said to me the other day, da, da, da. And I said no, I have nothing to add. And he said well, . . . I have a list here of things that concern me about you that Sergeant Cowan has provided, you're not the officer that I thought you were at all. And then he and Sergeant Cowan start to go in on a slew of things they say that I had done.

>           \*       \*       \*

> And then [Capt. Ayers] was saying a lot. I can't quite remember. He and Sergeant Cowan were speaking over each other. And then he referenced something and I said I don't know what you're talking about. I kept asking to see these papers. And he wouldn't let me see them. I said can I please look at those so I know what you're talking about. And he wouldn't give them to me. And then Sergeant Cowan mentioned a specific incident that I didn't recall her mentioning. And she was very excited and she said so are you calling me a liar? And I said no, I'm not calling you a liar.

> Q: Did she yell?

> A: She raised her voice, yes. She was very high strung. And I said no, I'm not calling you a liar. I believe that you think that you told me that. But you didn't. And that's when she said I'll take a lie detector test right now. And she was yelling at that point. And I said I'll take a lie detector test. And that's when Captain Ayers slammed his hands down on his desk and stood up and yelled stop or no or something to

that effect. And then he leaned over his desk at me with his lips drawn down and spittle coming from his face and he said I'll not be manipulated by you, I'll not be. You come in here crying witch hunt, witch hunt, this, that, na, na. Get out of my office.

Plaintiff, Lt. Finchum, and Sgt. Cowan left the office and went down the hall to the library, where plaintiff orally tendered her resignation. She testified:

A: That's when I said – I said I'm not doing this, I can't do this anymore, I can't do this anymore. And Finchum said what do you mean? And I said I'm going to give my two-week notice. And I guess he then went and told Ayers, because within minutes we were called back into Ayers' office.

\* \* \*

Q: And what happened in that meeting?

A: Captain Ayers said I understand you want to give your two weeks notice. And Finchum said you need to think about this. And I said I thought about this, this is a toxic environment. And Cowan said Wendy, this is a clean slate, clean slate, there's nothing in your file. As soon as we walk out this door, this never happened. And I turned to her very calmly and I said that would mean something to me if I trusted you, but I don't.

According to plaintiff, "then Captain Ayers said well, I cannot accept resignation from you unless it is in written form." This statement is in dispute; several other officers testified that the news of plaintiff's oral resignation was relayed to Chief Myers, who instructed Capt. Ayers to accept it. Plaintiff asked for the rest of the day off, and was told she would have to have a doctor's note.

Plaintiff got the note from her doctor and then returned to the police station. By this time, she had talked with her attorney and changed her mind about resigning. On the afternoon of the same day, plaintiff went to Kristi Inman, defendant's human resources manager. According to plaintiff, the following discussion occurred:

-4-

[Ms. Inman] said I have your resignation letter right here. And I said well, that's funny because I never wrote a resignation letter. I said I'm not resigning. And again she was confused. And she said well, it's going to take me a while to get your personnel file together, I'll call you when I have it. And I said okay. And I left. And about – it was between one and two that afternoon, she called. And she said I understand you wish to rescind your verbal resignation.

And I said I was told I had to give a written resignation. And she said no. And I said that's what I was told. And she said no, the chief has decided to accept your verbal resignation. And I said Kristi, I spoke to my attorney and if you no longer want me employed there then you have to fire me. And she said like I said, the chief has decided to accept your verbal resignation, you are not being required to work out your two weeks and we'll send somebody to get your vehicle.

Plaintiff subsequently applied to the Tennessee Department of Labor and Workforce Development for unemployment benefits. The Department denied her application based on its finding that plaintiff "voluntarily resigned her position after receiving a disciplinary warning from her supervisor." She appealed the decision, and it was affirmed after a telephonic hearing took place.

Plaintiff filed her complaint alleging retaliatory discharge under the TTPA, Tenn. Code Ann. § 50-1-304. Following discovery including at least eight depositions, defendant moved for summary judgment. At the hearing, the trial court granted the motion, stating, in pertinent part, as follows:

[T]he question then becomes, has the plaintiff shown enough to show that the termination was pretextual? And the answer to that is, in the court's opinion, no, they have not. This is a very high burden, you know, to show that the sole reason for the termination was in response to the report of the sexual discrimination and the excessive force, and that these job performance issues were pretextual in nature, and that burden being upon the plaintiff. And I cannot hold that the plaintiff has met that burden.

Now, if it were the situation where – if it were the situation that the plaintiff only had to show that the discrimination was a substantial factor, this case might be otherwise, might be otherwise, at least at the summary judgment stage. But here it is, I mean, it is a very high burden. And I just cannot see that the plaintiff has met that burden to show that those job performance issues were pretextual, and therefore, has not met, has not carried the burden of showing that the discrimination, even assuming that it existed, was the sole reason for the termination.

Plaintiff timely filed a notice of appeal.

## II.

Plaintiff raises the following issues:

1. Whether the trial court correctly granted summary judgment to defendant.

2. Whether defendant should be judicially estopped from claiming that plaintiff's employment was terminated for non-discriminatory reasons because defendant has taken the position that she voluntarily resigned.

## III.

Our standard of review of a grant of summary judgment is as stated by the Supreme Court:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness.

\*     \*     \*

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

***Rye v. Women's Care Ctr. of Memphis, MPLLC***, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015) (italics in original).

In making the determination of whether summary judgment was correctly granted,

[w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008); ***Luther v. Compton***, 5 S.W.3d 635, 639 (Tenn. 1999); ***Muhlheim v. Knox Cnty. Bd. of Educ.***, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See* ***White v. Lawrence***, 975 S.W.2d 525, 529 (Tenn. 1998); ***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995).

***Wells Fargo Bank, N.A. v. Lockett***, No. E2013-02186-COA-R3-CV, 2014 WL 1673745 at *2 (Tenn. Ct. App., filed Apr. 24, 2014).

**IV.**

In Tennessee, the general rule governing employment relationships that do not involve a contract for a definite term is the long-established employment-at-will doctrine. ***Guy v. Mut. of Omaha Ins. Co.***, 79 S.W.3d 528, 534-35 (Tenn. 2002); ***Sykes v. Chattanooga Housing Auth.***, 343 S.W.3d 18, 26 (Tenn. 2011). This doctrine "recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." ***Haynes v. Formac Stables, Inc.***, 463 S.W.3d 34, 36 (Tenn. 2015); ***Coleman v. Humane Soc. of Memphis***, No. W2012-02687-COA-R9-

CV, 2014 WL 587010 at *17 (Tenn. Ct. App., filed Feb. 14, 2014). "The employment-at-will doctrine is a bedrock of Tennessee common law," *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006), which "recognizes that employers need the freedom to make their own business judgments without interference from the courts." *Moore-Pennoyer v. State*, 515 S.W.3d 271, 278 (Tenn. 2017) (quoting *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015)).

The rule is not absolute, however; the Supreme Court and the General Assembly have recognized certain restrictions on the right of an employer to discharge an employee. *Id.* at 108-09. In *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552 (Tenn. 1988), *superseded by statute on other grounds, see Yardley v. Hosp. Housekeeping Sys., LLC*, 470 S.W.3d 800, 804 (Tenn. 2015), the High Court, discussing the tort of retaliatory discharge, stated the following:

> Both by statute and case law in this and other states some restrictions have been imposed upon the right of an employer to terminate an employee, usually for reasons of well-defined public policy. For example, . . . [t]here are restrictions upon employment or termination of persons for discriminatory reasons involving race, creed, color, sex, age, religion or national origin. *See* T.C.A. § 4-21-401(a).

> \*    \*    \*

> It is obvious that the exception cannot be permitted to consume or eliminate the general rule. Corporate management, in cases such as this, must be allowed a great deal of discretion in the employing or discharging of corporate officers, where the latter are not employed for a definite term and have no formal contract of employment. *Whittaker v. Care-More, Inc.*, 621 S.W.2d 395, 397 (Tenn. App. 1981). To be liable for retaliatory discharge in cases such as this, the employer must violate a clear public policy. Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision.

762 S.W.2d at 555, 556; *see also Williams*, 465 S.W.3d at 109 ("Retaliatory discharge is an important, but narrow, exception to the employment-at-will doctrine applicable only in limited circumstances.") (internal quotation marks omitted).

As the Supreme Court recognized in **Williams**,

> In addition to recognizing a common-law claim of retaliatory discharge, all fifty states have enacted legislation designed to encourage the reporting of wrongdoing by deterring retaliation against "whistleblowers," generally defined as "organization members . . . who disclose illegal, immoral, or illegitimate practices (including omissions) under the control of their employers, to persons or organizations who may be able to effect action."

**Id.** (footnote omitted; ellipsis in original). The "common-law cause of action is only available to private-sector employees, whereas the TPPA also extends protection to public employees." **Sweat v. City of McMinnville**, No. 2017-01141-COA-R3-CV, 2018 WL 1448740, at *3 (Tenn. Ct. app., filed Mar. 3, 2018).

Because plaintiff was a public employee, she is proceeding only under Tennessee's whistleblower legislation, Tenn. Code Ann. § 50-1-304, which provides in pertinent part as follows:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

> \* \* \*

> (c)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

The term "illegal activities" is defined at Tenn. Code Ann. § 50-1-304(a)(3) as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare."

Tennessee courts have emphasized that the retaliatory discharge "exception to the employment-at-will doctrine must be narrowly applied." **Stein v. Davidson Hotel Co.**, 945 S.W.2d 714, 717 n.3 (Tenn. 1997); **Chism**, 762 S.W.2d at 556; **Sykes**, 343 S.W.3d at

26 (describing the Whistleblower Act as a "narrowly crafted exception"); *Williams*, 465 S.W.3d at 109; *Jones v. City of Union City*, No. 2013-02358-COA-R3-CV, 2015 WL 9257815, at *6 (Tenn. Ct. App., filed Dec. 17, 2015) ("The Tennessee General Assembly enacted 'a stringent standard and set the bar high for recovery' for a retaliatory discharge claim pursuant to the TPPA.") (quoting *Williams*, 465 at 110).

The elements of a statutory retaliatory discharge action are as follows:

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Webb v. Nashville Area Habitat for Humanity*, 346 S.W.3d 422, 437 (Tenn. 2011); *Sykes*, 343 S.W.3d at 27; *Williams*, 465 S.W.3d at 111).

Defendant argues that plaintiff did not establish a prima facie case under the TPPA for two reasons. First, it asserts that "plaintiff's [a]mended [c]omplaint identifies no statute, regulation or ordinance tasked to protect the public interest that was allegedly violated in this case." Defendant made this correct assertion to the trial court in its memorandum supporting its summary judgment motion. In response, plaintiff cited *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 371 (Tenn. Ct. App. 2005), *overruled on different grounds by Haynes*, 463 S.W.3d at 41 n.6 (Tenn. 2015), wherein this Court recognized that sexual harassment is "illegal and against public policy," stating:

plaintiff testified that she was the victim of sexual harassment and assault/battery by Revis over a period of months, that she complained of said conduct to Revis and others, and that she was discharged shortly thereafter. The evidence of the behavior by Revis as testified to by the plaintiff, would be considered illegal and against public policy, as the State has enacted specific statutes dealing with harassment and assault and battery.

Plaintiff also cited 18 U.S.C. § 242, which provides, in pertinent part, as follows:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section, . . . shall be fined under this title or imprisoned not more than ten years, or both[.]

The trial court did not grant summary judgment on the ground that plaintiff failed to specifically identify in her amended complaint the alleged "illegal activity" she refused to remain silent about. Plaintiff did, in the trial court, cite authorities that would show that the conduct she complained of – sexual harassment of her by fellow police officers, and excessive force by other officers resulting in physical injury of an arrestee – was "illegal activity" covered by the Whistleblower Act. We affirm the trial court's decision not to grant summary judgment on this ground.

Second, defendant argues that plaintiff failed to establish a prima facie case because she could not show that it, as the employer, "discharged or terminated the plaintiff's employment." Defendant argues that plaintiff voluntarily resigned her employment, rather than being fired. It points to the deposition testimony of numerous persons, including Capt. Ayers, Chief Myers, Human Resources Officer Inman, and City Administrator Russell Treadway, to the effect that Chief Myers directed Capt. Ayers to accept plaintiff's oral resignation. It is not disputed that plaintiff voluntarily orally submitted her resignation,[1] and shortly thereafter twice reaffirmed her decision to do so after being asked to reconsider. However, plaintiff testified that Capt. Ayers told her that she was required to submit a written resignation. Sgt. Cowan also testified that "basically, he [Capt. Ayers] asked her for a written notice." Plaintiff also relies upon the defendant's employment handbook, which states that "[a] minimum of two (2) weeks' written notice is expected of all resigning personnel." Defendant responds by arguing that the handbook is not a binding contract of employment, and that the term "expected" should not be interpreted as "required" in this context. The trial court held that there

---

[1] Plaintiff has not presented a claim or argument that the doctrine of constructive discharge should apply in this case.

-11-

were disputed issues of fact regarding whether plaintiff was terminated or resigned, such that summary judgment on this ground would be improper. For purposes of summary judgment, we accept as true plaintiff's factual assertions, and so we agree with the trial court's determination.

If a plaintiff establishes a prima facie claim under the TPPA, the burden shifts to the defendant under "the familiar *McDonnell Douglas*/*Burdine* burden-shifting analysis [of] the parties' proof." *Williams*, 465 S.W.3d at 111-12. As the Supreme Court reiterated in *Williams*,

> if an employee proves a prima facie case of retaliation, the employee creates a rebuttable presumption that the employer unlawfully retaliated against him or her. The burden of production shifts to the employer to articulate a legitimate and nonretaliatory reason for the action. If the employer satisfies its burden, the presumption of retaliation "drops from the case," which sets the stage for the factfinder to decide whether the adverse employment action was retaliatory. The employee, however, "must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for retaliation."
>
> *Gossett*, 320 S.W.3d at 780–81 (citations omitted). Despite the fact that "intermediate evidentiary burdens shift back and forth under this framework," the ultimate burden of persuading the trier of fact that the employer engaged in unlawful retaliation remains at all times on the plaintiff employee.

*Id.* at 112-13 (ellipses and brackets in original omitted).

We have observed that "[t]he sole causation element of a TPPA claim has an important impact at this stage." *Jones*, 2015 WL 9257815, at *6. The *Williams* Court explained this as follows:

In articulating a non-retaliatory reason for discharging the employee, the defendant employer in a TPPA case need not proffer evidence that unlawful retaliation was no part of its decision to terminate employment. Rather, the employer need only introduce admissible evidence showing that unlawful retaliation was not the *sole* cause of the employment action. That is, the employer must proffer evidence that, even if retaliation was a motivation for the discharge, there was at least one non-retaliatory reason as well.

The burden to submit evidence at trial of a non-retaliatory motive is one of production, not persuasion. Because retaliatory discharge is an exception to the employment-at-will doctrine, the employer's proffered non-retaliatory reason for discharging the employee need not be a sound one; it need only be a reason *other than* retaliation.

*Williams*, 465 S.W.3d at 115 (internal citations omitted; italics in original).

In the present case, defendant argued that it had several legitimate, non-retaliatory reasons for plaintiff's termination. The trial court agreed, as do we. First, defendant documented deficiencies in plaintiff's employment performance, as memorialized in Sgt. Cowan's disciplinary/counseling report dated June 13, 2015. Sgt. Cowan testified on this point as follows:

Q: As you were supervising Ms. Weinert, how did Ms. Weinert perform for you?

A. At first, she was doing fine. She was writing tickets, she was answering her calls. And then I started receiving complaints that she was not backing up officers. . . . That was late May [of] 2015.

Q. Who made those complaints to you?

A. Several people on the shifts, Brantley, Perry, Fox.

\* \* \*

-13-

[F]or example, one of the calls that we went on, we were trying to serve a warrant on an aggravated domestic/stolen vehicle situation. We had had prior incidents with that fellow and we knew that he was potentially violent. We went to his brother's house where he's known to reside to try and serve that warrant.

Officer Weinert was the first one to the door. She knocked on the door and the brother came to the door, said he was there. She didn't ask if we could come in or – you know, for officer safety, we really don't want people to go back in the house. They could get guns, they could come back – you know, it could become a violent situation. So we usually ask to enter to go with them to find that person. She never did ask.

\* \* \*

Q. All right. How about Officer Brantley? His complaint was that she's not backing people up?

A. Not backing people up and avoiding calls.

Q. All right. Those are two different things. Let's start with not backing people up.

A. . . . [T]he zone officers, . . . wanted to rotate the opposite direction on alternate [zone rotations]. And the reason for that was, because nobody want[ed] to work 12 hours with Officer Weinert because they were pulling the major load of the day.

Q. All right. So that is particular to Officer Brantley, correct?

A. No. There was several officers, yes.

Q. Okay. And there are – okay, several officers that don't want to work with Officer Weinert?

A. For the entire shift.

-14-

Q. For the entire shift.

A. Because they were ending up with all the calls, all the reports. She never backed them up.

\*   \*   \*

[O]nce I received the complaints from the other officers, I was actively listening to the radio to determine if their complaints had any validity to it. Once I was listening to the radio and keeping up with what was going on, I did believe that their complaints were valid.

Second, plaintiff did not dispute that despite having witnessed the alleged incident of excessive force, she did not report it until after about eighteen months had passed:

Q. So you waited a year and a half until first telling the captain about this; isn't that correct?

A. That's correct.

Q. Isn't it your duty as a police officer to report this up the chain of command if you actually reasonably believed that there was excessive force here?

A. Yes.

Q. And yet you didn't do that, did you?

A. That's correct.

Q. You didn't live up to your duty as a sworn police officer; isn't that correct?

A. That's –

MR. LOOPER: Object to the form.

-15-

BY MR. SPAULDING: You fully admit that under oath, don't you? You just admitted it?

A. Yeah.

Third, plaintiff, after having been disciplinarily counseled and presented with a list of performance expectations that she does not argue were unreasonable, voluntarily orally resigned her employment. After the other officers suggested that she "think about this" and offered her a "clean slate" for her employment status, she twice affirmed her commitment to resign. Even assuming, for summary judgment purposes, that plaintiff's oral resignation was ineffective because defendant required a written one and plaintiff expressed her intent to rescind it, and that defendant's refusal to accept her rescission was a "termination" under the TPPA, plaintiff's tender of resignation could be a reasonable, non-discriminatory reason for her termination. On this point, Chief Myers testified:

Q. After you found out she didn't want to resign why didn't you just let her come back to work?

A. Well, I'm just not sure that would have been a good idea. If you come in and decide you're going to quit, in my experience over the years, people who are going to quit, it's best to let them quit.

Fourth, at the end of the meeting where plaintiff resigned, she told Sgt. Cowan, her supervising officer, that Sgt. Cowan's word meant nothing to her because she didn't trust her. As defendant argues, these factors can reasonably lead to a legitimate, non-retaliatory conclusion that plaintiff should not have continued to be employed on the police force.

Once an employer identifies a legitimate non-retaliatory reason, the employee is provided "a full and fair opportunity to demonstrate that the employer's proffered reasons are pretextual and that unlawful [retaliation] was the true reason for the challenged employment action." *Williams*, 465 S.W.3d at 118 (brackets in original). The Supreme Court has provided the following guidance on the pretext analysis:

the question becomes whether the plaintiff has established that it is more likely than not that the employer's proffered reason 'is mere pretext and thus a coverup' for the employer's true retaliatory motive." In evaluating the evidence, the trial court must look at all of the evidence, including evidence submitted by the plaintiff to establish his prima facie case.

-16-

Circumstantial evidence is also considered. The trial court must take into account any evidence that exposes the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered explanation. After doing so, it must decide whether the evidence as a whole gives rise to an inference that the employer's proffered non-retaliatory reason is pretextual.

In *Versa v. Policy Studies, Inc.*, the Court explained the concept of pretext:

> The question is not whether the employer's decision was sound, but whether the employer's asserted reason for the adverse employment decision is pretextual. The reasonableness of an employer's decision may be considered, but only so far as it "illuminates the employer's motivations." "The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext."

*Versa*, 45 S.W.3d [575] at 581 [Tenn. Ct. App. 2000]. In short, the plaintiff must show that the employer lied about the reason it gave for terminating the plaintiff's employment, in order to mask its true retaliatory motive. *Id*. at 583.

Pretext is typically shown in one of three ways: (1) by establishing that the employer's proffered reasons have no basis in fact, (2) by establishing that the proffered reasons did not actually motivate the discharge, or (3) by establishing that they were insufficient to motivate the discharge. The first is accomplished by showing that the proffered reason is based on facts that are not true; this calls into question the reasonableness of the employer's decision to discharge. Regarding the second *Versa* method of establishing pretext—showing that the proffered non-retaliatory reason did not actually motivate the discharge—a plaintiff may either produce evidence that the adverse employment decision was more likely motivated by retaliation or "show that the employer's explanation is not credible." Lastly, to show that the proffered reason is insufficient to motivate the discharge,

the employee must produce evidence that other employees who engaged in substantially the same non-protected conduct were not fired.

*Williams*, 465 S.W.3d at 118-19 (internal citations omitted).

Plaintiff's argument that defendant's reasons for firing her were pretextual focuses on two things. First, plaintiff argues that the video recording of the alleged incident of excessive force does indeed actually show that the accused officers used excessive and unwarranted force resulting in unnecessary injury to the arrestee, contrary to Chief Ayers' conclusion after he watched it in the course of his investigation. Second, plaintiff points to the undisputed fact that her employee file contains no reprimands or other disciplinary action before June of 2015. She does not, however, address the concerns raised in the disciplinary/counseling report filed by Sgt. Cowan on June 13, 2015. We are of the opinion that, considering all factual allegations and inferences in plaintiff's favor, a trier of fact could not reasonably conclude that the *sole* reason for plaintiff's termination was unlawful retaliation by defendant. *See, e.g., Jones*, 2015 WL 9257815, at *12 (affirming summary judgment where "[e]ven viewing all the evidence in the light most favorable to Plaintiffs, a reasonable juror could not conclude that the sole reason for the Plaintiffs' termination was their refusal to conceal or remain silent about Hogg's illegal activity"); *Yount v. FedEx Express*, No. W2015-00389-COA-R3-CV, 2016 WL 1056958, at *8 (Tenn. Ct. App., filed Mar. 17, 2016) (affirming summary judgment where plaintiff "failed to present evidence sufficient to allow a reasonable fact finder to conclude that [defendant's] explanation for his termination was a pretext for discrimination"). The trial court's summary judgment on this ground is affirmed.

Finally, plaintiff argues that defendant should be judicially estopped from claiming that her employment was terminated for non-discriminatory reasons, because it has taken the position that she voluntarily resigned. However, plaintiff did not raise the issue of judicial estoppel with the trial court, as defendant correctly argues. "Under Tennessee law, issues raised for the first time on appeal are waived." *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996). Furthermore, defendant did not take such "inconsistent and contradictory positions" as to warrant the application of the judicial estoppel doctrine, but rather simply argued in the alternative. *Barnes v. Barnes*, 193 S.W.3d 495, 500 (Tenn. 2006). In other words, defendant argued first that plaintiff voluntarily resigned; and *in the alternative*, if the trial court found she did not, then that she was terminated for legitimate non-retaliatory reasons. In *Barnes*, the Supreme Court recognized that "alternative pleadings are expressly permitted, regardless of consistency," and declined to apply the judicial estoppel doctrine where a litigant argued in the alternative. *Id.* at 501.

## V.

The trial court's summary judgment in defendant's favor is affirmed. Costs on appeal are assessed to the appellants, Wendy Sterling Weinert and Matthew Walter Weinert.

_____
CHARLES D. SUSANO, JR., JUDGE