IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2022

## BENJAMIN MCCURRY v. AGNESS MCCURRY

**Appeal from the Circuit Court for Washington County**
No. 38147     James E. Lauderback, Judge
_____

## No. E2022-00635-COA-R3-CV
_____

Appellant/Mother filed a post-divorce petition for contempt against Appellee/Father for alleged violations of the parenting plan. Mother also moved to change the child's primary residential parent from Father to her. The trial court held that there was no contempt and further held that there was not a material change in circumstances to warrant a change in the child's primary residential parent. Mother appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Agness McCurry, Johnson City, Tennessee, appellant, pro se.

Sandy Phillips, Johnson City, Tennessee, for the appellee, Benjamin McCurry.

## OPINION

### I. Background

Appellant Agness McCurry ("Mother") and Appellee Benjamin McCurry ("Father") were married on September 24, 2016. One child, Isaiah, was born to the marriage in July 2017. The parties separated in August 2018 and were granted a divorce on March 5, 2019, by order of the Circuit Court for Washington County ("trial court"). Father was named the child's primary residential parent, and Mother was granted limited, supervised visitation due to testimony during the trial concerning the state of her mental health. The trial court delayed entry of a permanent parenting plan until the parties

participated in the First Judicial District Court Clinic "for their assistance, not only with supervision of visitation, but also assistance with evaluating Mother's fitness and ability to safely exercise parenting time without supervision."

The trial court entered a permanent parenting plan by order of October 9, 2019. As is relevant to this appeal, the permanent parenting plan: (1) named Father the primary residential parent; (2) granted each parent decision making authority "regarding the day-to-day care of a child while the child is residing with that parent"; (3) granted Father decision-making authority over the child's education and non-emergency health care; and (4) granted the parties joint decision-making authority concerning the child's religious upbringing and extracurricular activities. An addendum to the parenting plan provided that Father would be responsible for transporting the child for visits with Mother until such time as Mother obtained her own transportation.

On October 17, 2019, Mother filed a motion seeking the trial judge's recusal. As set out in Mother's affidavit filed in support of her recusal motion, she asserted various incidents of alleged bias on the part of the trial judge. The judge denied the motion by order of October 29, 2019. Mother did not appeal the trial court's order denying recusal.

On June 19, 2020, Mother filed a petition to be named the child's primary residential parent. Father opposed the petition. By order of August 17, 2020, the trial court denied Mother's petition, finding that there was no material change in circumstances that would warrant a new custody arrangement. Thereafter, the parties filed cross-motions for contempt. Mother alleged that Father was in contempt for failure to pay his share of the child's medical expenses. Father alleged that Mother was in contempt for failure to pay child support as ordered. The trial court heard the cross-motions on November 6, 2020. By order of November 13, 2020, the trial court denied both motions.

Giving rise to the immediate appeal, on April 5, 2022, Mother filed a motion for contempt and for modification of child custody. In relevant part, Mother averred:

> The beginning paragraph of the parenting plan states: "The mother and father will behave with each other and each child so as to provide a loving, stable, consistent and nurturing relationship with the child even though they are divorced. They will not speak badly of each other or the members of the family of the other parent. They will encourage each child to continue to love the other parent and be comfortable in both families."
> Father notified me about his new relationship with Kelly Jean Wray (hereinafter "Girlfriend") by text message on October 13th 2021 see Exhibit A.[1] In his last words he stated that he wanted to "honor" my role as Isaiah's

---

[1] Exhibit A is a text message from Father to Mother. It states:

mother. However, He did not mean those words; He decided to use his new relationship to disrespect me and drive a wedge between my son and I.

Girlfriend's Facebook cover picture contains what appears to be a "family picture" with my son. I had no knowledge or hadn't given permission for my son's picture to be publicly displayed on her profile. See Exhibit B.[2]

Our son informed me on Friday April 1st 2022 after Father dropped him off that he does not go to school anymore but stays at "Kelly's house". Father stated that his reason for removing our son from preschool was in order to save money for his upcoming wedding. I am not against his intentions to remarry but I disagree with the disruption of my son's education. See Exhibit C.[3]

Father told me that Girlfriend lives in a "house" but after further research it was determined that she resides in a trailer park with her two sons. To my knowledge trailer homes are somewhat restricted in space. Our son lives in his Grandparents' house with his father and his own room.

The parenting plan also states that "Each parent shall make decisions regarding the day-to-day care of a child while the child is residing with that parent, including any emergency decisions affecting the health or safety of a child."

Father has left Girlfriend in charge of our son while he works during the day without my knowledge. Not knowing the character, morals and

---

Hey Agness, I'm sending you this message to apologize for my part in the way things ended up in our relationship and let you know that I've forgiven you for yours. It has taken me a while to really process all those feelings and emotions as I'm sure it has for you and I would really like to move on from that part of our lives. I want you to know that I appreciate all you do for Isaiah. He loves spending time with his mommy. Hopefully, in the future, we can discuss a parenting plan that allows us to have equal time with him. I feel that more time with you would be beneficial for him. I also want to let you know that I've met someone I am interested in pursuing a relationship with. We go to church with each other and have become great friends. I'm sure you've heard Isaiah say he wants to go to see Miss Kelly by now. She is the mother of the 2 boys you saw on video chat the other day. They all love Isaiah very much. I believe letting you know my intentions was the right thing and I want to honor your role as Isaiah's mother.

[2] Exhibit B is a collection of photographs of Father, Girlfriend, her two children, and Isaiah.
[3] Exhibit C is a text exchange between Mother and Father. In relevant part, it provides:

[Text from Mother to Father]: Isaiah is telling me that you don't take him to school anymore but Kelly's house. What is going on?

[Text from Father to Mother]: Yes, it's easier for her to watch him during the day.

[Text from Mother to Father]: If you don't pick up my call am calling dcs on Kelly.

[Text from Mother to Father]: Try me.

background of his Girlfriend brings me great concern for the safety of our son and his daily activities. When I voiced my concerns with Father on the phone Friday April 1st 2022, he stated that being a primary parent enabled him to do whatever he wanted. . . . Since our son is with Father's Girlfriend during the day, I assume that if Father was unreachable she would make emergency decisions without my consent.

Father stated to me that his Girlfriend is a divorcee and has custody of her two sons; Being a first time mother I have been deprived of the right to enjoy the fruit of my womb. In addition, our son is Biracial and I am concerned with his lack of exposure to diversity. Father's actions are hindering the purpose of the parenting plan which is to foster a continuing relationship of love between both parents for the best interest of the child.

Father repeatedly demonstrates that he does not care about the best interests of the child. At 2 years old the family court clinic observed that our son was developmentally delayed during Father's custody. I am concerned with our son being withdrawn from preschool as it might hinder his educational development and social activities.

When it comes to "Extra Curricular Activities" the parenting plan stated that it is a "JOINT" decision. Sadly, Father made those decisions without my consent.

Father is aware that our son goes to Just Jump Trampoline Park. On Sunday April 3rd 2022, I learned that my son has a recurring Monthly Pass of $32.85 automatically renewed on Girlfriend's debit card. I was surprised that she was participating in his extra-curricular activities without my consent. See Exhibit D.[4]

I am concerned about the child support payments I am paying to Father because he included my son's preschool as part of his expenses. Father stated to me that his Girlfriend is unemployed and receives child support payments as her income. I suspect that my child support payments may be covering our son's expenses while she provides daycare and his monthly pass.

Therefore, the court needs to determine how the child support payments are being spent currently. If they are being misused, the court must hold Father in contempt.

The parenting plan designated Mother 74 days and Father 291 days to spend with the child. Father has now placed our son in Girlfriends care as part of those 291 days. My son stated that he even spends nights at Girlfriend's trailer while it is unclear now whether Father has moved in with her or not. This new arrangement is contrary to the parenting plan and Father must be held accountable by the court.

---

[4] Exhibit D is a receipt for a "recurring monthly pass" to Just Jump Trampoline Park.

- 4 -

Concerning Mother's petition to modify custody, she asserted that the foregoing averments constituted a material change in circumstances and further averred that

> Father's actions are deleterious to the welfare of our son because he is attempting to erase my role and influence as the Mother. Our son now refers to his Girlfriend as "Momma Kelly" repeatedly in my presence. In addition, Father's dishonesty and deception regarding the whereabouts of the child is something that the court must consider. In one case a parent was stripped of custody due to a pattern of dishonesty and deception to the court.

> \*\*\*

> In addition, I have stable housing with a bedroom for our son. If daycare and homeschooling is required I am in a position to provide that effectively since I work from home and should have been the primary point of care for our son. Because our son is Biracial with African origin, I will be better equipped to connect him with his African culture. It is very important that he be exposed to both sides of his heritage.

On May 5, 2022, the trial court held a hearing on Mother's petition for contempt and change of residential parent. Based on our review of the transcript and the trial court's ruling, it appears that other allegations of contempt, aside from those specifically enumerated in Mother's petition *supra*, were tried by consent of the parties. Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). By order of May 6, 2022, the trial court denied Mother's petition for contempt as well as her petition to change the child's residential parent. In relevant part, the trial court found:

> The Court first heard testimony from both parties on Mother's contempt allegations. These included her efforts to hold Father in contempt for 1) alleged difficulty in dealing with Father to change the location of exchange of the child on one occasion; 2) Father's communicating with Mother's family via his Facebook page; 3) Father's unilateral decision to remove the child from preschool; 4) Father's "extracurricular" activities with the child; and 5) Father's alleged religious instruction of child without Mother's joint decision-making input.
> The Mother and Father were the only persons to testify. The Court makes the following findings of fact . . .
> 2) The current location of exchange of the child is the Food Stamp office in Johnson City;
> 3) On April 15, 2022, Mother called Father at work and requested they exchange the child in Bristol, rather in Johnson City, as she was traveling

back through that city from a trip;

4) A series of text exchanges about this issue were introduced (Ex. 2) which shows Father attempted to compromise with Mother on the time for the exchange and in fact, ultimately did take the child to the Bristol location as she requested;

5) Father posted pictures of the parties' child, himself and his fiancé on his Facebook page. Mother's family commented about his post and Father replied to their comments. This was the extent of Father's "communication" with Mother's family;

6) Father unilaterally removed their child from preschool after it was determined the child needed more "one on one time." Father has sole decision-making authority with regard to the child's education;

7) Mother complained that she had joint decision-making rights concerning the child's "extracurricular activities" and that Father failed to seek her input. The only testimony on this issue was that Father took the child to a trampoline park without Mother's input or knowledge. The Court, after hearing this testimony, ruled that this was not an "extracurricular activity" that required Mother's input, but simply normal parenting time activities;

8) Mother alleged that Father was teaching the child some type of religious belief without her input, despite joint decision-making on religious upbringing. Her only proof of this allegation involved a "hand symbol" (Ex. 4) which she stated the child showed her. Father denied this and testified he is a Christian. The Court finds Father's testimony on this issue to be more credible. Both parties agreed that the child shall receive a religious upbringing based on Christian, biblical principles; and

9) Father's fiancé now watches the child during the day. Both Mother and Father's fiancé work from home each day. Father's fiancé has two other children, both of whom are in public school. Father's fiancé is also taking classes in psychology.

Based on the foregoing findings of fact, the trial court reached the following conclusions of law:

Based on the testimony presented, the Court finds and concludes that Father has not violated the Permanent Parenting Plan order.

Mother's frustrations with Father above deviating from the Parenting Plan to exchange the child did not evidence a violation of the Order. Father did, in fact, concede to Mother's wishes and transported the child to a different location as she requested, though not required to do so under the Parenting Plan.

Mother's frustrations with Father's communications with her family, in reply to their comments on his Facebook post, is not a violation of the Parenting Plan.

Mother's frustrations with Father removing the child from preschool do not evidence a violation of the Parenting Plan. Father has sole decision-making authority over the child's educational decisions.

Father's decision to take the child to a trampoline park, during his parenting time, is not an "extracurricular activity" that requires input from Mother. The same would be true if Mother decided to take the child to a park, a zoo, or any other normal activity that occurs during parenting time.

The parties agreed that the child would be raised with a Christian belief. Mother's allegations of Father's religious instruction to the child are unfounded and the Court concludes there has been no violation of the Parenting Plan.

In summary, the Court DISMISSES all of Mother's contempt petition allegations against Father, finding Father has not violated any terms of the parties' Parenting Plan.

Mother's petition also sought to change custody of the child, to make her the primary residential parent. During her testimony she requested that if custody was not changed, for the Court to at least modify the Parenting Plan to increase her parenting time.

The parties were advised, during the court's oral ruling, of the standard that applied when a party seeks to change either custody or visitation as set forth in T.C.A. §36-6-101(a)(2)(B) and (C).

From the testimony presented by Mother, the Court does not find a material change of circumstances that would justify changing custody, or a material "change of circumstances affecting the child's best interest" that would justify modifying the visitation schedule.

Therefore, Mother's Petition for Change of Custody is likewise DISMISSED.

Mother appeals.

## II. Issues

Mother raises twenty-five issues in her appellate brief. Respectfully, Mother's statement of the issues exceeds the scope of our review as the majority of the questions urged were not specifically raised or addressed by the trial court. It is well settled that "[i]ssues raised for the first time on appeal are waived." *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996). Furthermore, several of Mother's issues concern allegations of bias and prejudice on the part of the trial court. As noted above, Mother filed a motion for recusal, which was denied by final order entered on October 29, 2019. Mother did not file a timely appeal of that order; as such, this Court lacks subject matter jurisdiction over these questions. *See, e.g., Ball v. McDowell*, 288 S.W.3d 833, 837 (Tenn. 2009) (dismissing an appeal because the notice of appeal was not filed within thirty (30) days of entry of the final judgment and the Court of Appeals, therefore, lacked subject matter jurisdiction).

In her Notice of Appeal, Mother appeals the trial court's May 6, 2022 order. As set out in context above, in that order, the trial court only addressed Mother's petition for change of residential parent and contempt. Accordingly, the scope of our review is limited to these two issues: (1) Whether the trial court erred in denying Mother's petition for contempt; and (2) Whether the trial court erred in denying Mother's petition for change of residential parent. We will limit our discussion to these issues.

### III. Standard of Review

Our review of a trial court's findings of fact is de novo upon the record accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. Civ. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012).

Before turning to the issues, we further noted that we are mindful of the fact that Mother is proceeding pro se. "While entitled to fair and equal treatment before the courts, a pro se litigant is still required to comply with substantive and procedural law as do parties represented by counsel." *Gilliam v. Gilliam*, No. M2007-02507-COA-R3-CV, 2008 WL 4922512, at *3 (Tenn. Ct. App. Nov. 13, 2008) (citing *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003)). As explained by this Court, "[t]he courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *Jackson v. Lanphere*, No. M2010-01401-COA-R3-CV, 2011 WL 3566978, at *3 (Tenn. Ct. App. Aug. 12, 2011) (quoting *Hessmer*, 138 S.W.3d at 903 (internal citations omitted)). "[T]he courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe." *Hessmer*, 138 S.W.3d at 903. With the foregoing in mind, we turn to the issues.

### IV. Contempt

Mother asked the trial court to find Father in contempt based on his alleged violations of the permanent parenting plan. "After a permanent parenting plan has been incorporated into a final order or decree, the parties are required to comply with it unless and until it is modified as permitted by law." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 496 (Tenn. 2017); *see also Armbrister*, 414 S.W.3d at 697. A person can violate a court order "'by either refusing to perform an act mandated by the order or performing an act forbidden by the order.'" *In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *8 (Tenn. Ct. App. Feb. 23, 2018) (quoting *Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510-11 (Tenn. 2005)).

Mother's petition for contempt does not indicate whether she is seeking a finding of criminal or civil contempt. At the hearing, the trial court stated, "[T]he pleading does not specify whether it's a motion for civil contempt or criminal contempt. I'm treating it as a motion for civil contempt for violation of the parenting plan." At trial, Mother protested that she was pleading criminal contempt. The trial court stated that it would dismiss the petition if Mother was proceeding on criminal contempt because her petition did not comport with Tennessee Rule of Criminal Procedure 42. Tenn. R. Crim. P. 42(b)(1) ("Content of Notice. The criminal contempt notice shall: (A) state the time and place of the hearing; (B) allow the alleged contemner a reasonable time to prepare a defense; and (C) state the essential facts constituting the criminal contempt charged and describe it as such."). Indeed, Mother's petition fails to comply with the foregoing rule. However, rather than dismissing Mother's contempt petition, the trial court treated it as one for civil contempt and adjudicated the petition on the merits. There was no error in this as it worked a benefit to Mother.

Turning to the requirements for civil contempt, as outlined in ***Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.***:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."
>
> The threshold issue in any contempt proceeding is whether the order alleged to have been violated is "lawful.". . . Naturally, the determination of whether a particular order is lawful is a question of law.
>
> The second issue involves the clarity of the order alleged to have been violated. A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. The order must, therefore, be clear, specific, and unambiguous.
>
> \*\*\*
>
> The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. Thus, decisions regarding whether a person actually violated a court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).
>
> The fourth issue focuses on the willfulness of the person alleged to

have violated the order. The word "willfully" has been characterized as a word of many meanings whose construction depends on the context in which it appears. Most obviously, it differentiates between deliberate and unintended conduct. However, in criminal law, "willfully" connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose.

In the context of a civil contempt proceeding under Tenn. Code Ann. § 29-2-102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. . . . Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding "willfulness" should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

***Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.***, 249 S.W.3d 346, 354-57 (Tenn. 2008) (citations, headings and footnotes omitted). Here, Mother does not contest the lawfulness or clarity of the parenting plan, and so our analysis will focus on the third element for civil contempt, i.e., whether Father violated the order. The trial court held that he did not.

At trial, Mother asserted that Father was in contempt because he: (1) was "abusive" to Mother when, on a single occasion, she requested a different drop-off point for exchanging the child, which point was approximately forty minutes farther for Father to travel; (2) engaged in private communications with Mother's family and sent pictures of himself, his girlfriend, her children, and Isaiah to Mother's mother; (3) removed the child from preschool; (4) included his girlfriend in the child's "extracurricular activities" at a trampoline park; and (5) instructed the child in Hindu practices although the parenting plan provided that the child's religious upbringing would be based in Christianity. We will review each of these allegations against the record.

## A. Abusive Texts

The following texts were exchanged between Mother and Father on April 15, 2022, after Mother requested a different drop-off point. The texts were admitted into evidence as exhibit 2:

**[From Mother to Father]**: Returning to Johnson City today. It's a long drive. I can pick up Isaiah from Food City in Bristol TN.
**[From Father to Mother]**: I can meet you at the food city in colonial heights at this address. 1911 Moreland Dr., Kingsport, TN 37663.
**[From Mother to Father]**: That is not on my route.
**[From Mother to Father]**:1430 Volunteer Pkwy, Bristol, TN 37620
**[From Mother to Father]**: I will meet you there, ok.

**[From Father to Mother]**: That's 40 minutes from my house.  Is there anywhere on your route that is closer.

**[From Mother to Father]**: Well you were able to violate the parenting plan so [I] am sure 40 minutes isn't that big of a deal now is it.

**[From Mother to Father]**: I would love to be understanding but you have not shown me any of that at all.  Making decisions behind my back regarding our son.

**[From Mother to Father]**: Co-parenting has been a nightmare with you.  You are not truthful at all.  You play games with people then expect them to be nice while you be [sic] mean.  It's not payback at all.  Am just showing you that am not obligated to be a good person when someone disrespects me.

**[From Father to Mother]**: I'm not sure what games you're referring to or what I've done that is mean.  I'm trying to compromise with you on a different drop-off location.  I'm not obligated to do that either.  I do not want to argue with you about it.  I can drop Isaiah off in Bristol, but I will be a few minutes late.

**[From Mother to Father]**: . . . Discovering all those moves that you made without consulting me are the games [I] am talking about.  You only refer to the parenting plan when i[t] suits your abusive desires.  Now your [sic] saying that you are not obligated to drop off Isaiah where [I] am telling you to.  Am doing my best to follow the parenting plan but now you are even attempting to threaten that you can refuse and do what you want.

**[From Father to Mother]**: . . . I will see you at 1430 Volunteer Pkwy, Bristol, TN 37620 a little after 6pm.

**[From Mother to Father]**: That's why I prefer to go to court because you do not have the capability to reason and understand that a normal person does.  Truth is an argument with you.  You don't like being confronted.  Sadly that's not how the world works.  Even spoiled brats that think the world is their oyster soon realize that.

**[From Mother to Father]**: When you arrive come by the food city gas station.  [I] [a]m parked right next to the sign showing the gas prices.

**[From Father to Mother]**: Ok.

In the first instance, the parenting plan provides that the drop-off location will be the Food Stamp office in Johnson City.  In the foregoing text exchange, it is Mother who is asking to modify that location.  Father was under no obligation to do so; however, the text clearly evidence that Father was trying to be cooperative and accommodating.  Father merely asks whether there is an alternate location closer to his location.  This was a reasonable request; however, Mother responded with ire and continued in that vein until Father agreed to meet where Mother wanted to meet.  As the trial court stated from the bench:

From my interpretation of the text messages, Exhibit 2, [Father] was bending over backwards to [cooperate]. He says, "I'm trying to compromise with you." You—the mother was asking him to travel 30 to 40 minutes different from where the child is normally exchanged and he was trying to work out that compromise with her. So I do not find that that has been a violation of the parenting plan.

We agree. There is no reading of the foregoing texts under which Father could be held in contempt of the trial court's orders. Not only was Father under no legal obligation to accommodate Mother's request for a different exchange point, but he ultimately conceded to her request and made the additional drive.

## B. Facebook Communication

Mother's second ground for contempt involves photos that were posted on Father's Facebook. Isaiah is included in the photos, along with Father's girlfriend's children. In response to the photos, Mother's mother posted the word "lovely" with four heart emojis. Father then replied: "have you checked your messenger? I've sent you some photos there." Mother's mother then replied: "ohh, I just switched on the phone. Been ill for more than ten days. Started feeling well today. Greetings to you, Kelly and the boys." From the evidence, there was nothing negative in the foregoing exchange. It appears that Father was merely sharing photos of the child with the child's grandmother. Regardless, there is nothing in the parenting plan that would preclude such action on Father's part. As the trial court noted from the bench:

I do not find that the parenting plan prohibits that in any fashion. Mr. McCurry testified that he has a Facebook page and he's posted pictures on there and that Ms. McCurry's family has commented on that and he's communicated with her family in response to those comments. So I – there's nothing in the parenting plan that prohibits that, so I do not find that that is a violation of the parenting plan.

Father's efforts to share photos of the child with his maternal grandmother should be commended. At any rate, this benign exchange is in no way contemptuous.

## C. Preschool

There is no dispute that Father withdrew Isaiah from preschool. However, there appears to be a reasonable basis for Father's decision. Trial exhibit 4 is a letter from the child's school. In relevant part, it states:

Isaiah McCurry was a student at Sundale Early Learning Academy for a little over two years. In the last six months of Isaiah's attendance, we had several

meetings with Ben McCurry to collaborate on the best way to help Isaiah succeed. We felt that he would benefit from a smaller group setting or a one-on-one environment. Isaiah's dad, Ben, was able to find more appropriate care for him and withdrew him from our care in February, 2022.

Regardless of the basis for Father's decision, there is no dispute that the parenting plan grants Father sole decision-making authority regarding the child's education. Although Mother may disagree with Father's decision regarding the child's preschool, Father's actions are not contemptuous in view of his decision-making authority over the matter.

## D. Extracurricular Activities

The next allegation of contempt concerns Father's decision to take the child to a trampoline park. Mother asserts that this decision constituted an "extracurricular activity," over which she had joint decision-making authority. The trial court held that this activity did not constitute an extracurricular activity as contemplated under the parenting plan. As the trial court explained from the bench:

> I don't think a activity such as this that a parent exercises while they're in their parenting time—exercising their parenting time with the child is an extracurricular activity. . . . So, I do not find that his activities are extracurricular in nature and requiring any joint decision-making by the parents.

We agree.

## E. Religious Upbringing

Concerning religious upbringing, Mother submitted Exhibit 4, which is a drawing of two hands forming a triangular shape between them. Mother claimed that this photo was a Hindu symbol. Father denied any knowledge of the drawing, reasserted that he was a practicing Christian, and averred that the child was being brought up in that faith. As set out in its order, *supra*, the trial court credited Father's testimony over Mother's on the issue of the child's religious upbringing. This Court is "required to defer to the trial court's credibility findings. . . ." ***Williams v. City of Burns***, 465 S.W.3d 96, 120 (Tenn. 2015); *see also* ***Street v. Street***, No. E2016-00531-COA-R3-CV, 2017 WL 1177034, at *7 (Tenn. Ct. App. Mar. 29, 2017). In ***Wells v. Tennessee Board of Regents***, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

> trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See* ***State v. Pruett***, 788 S.W.2d 559, 561 (Tenn. 1990); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See* ***Tenn-Tex Properties v. Brownell-Electro, Inc.***, 778

S.W.2d 423, 425-26 (Tenn. 1989); ***Mitchell v. Archibald***, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See* ***Humphrey v. David Witherspoon, Inc.***, 734 S.W.2d 315, 315-16 (Tenn. 1987); ***Bingham v. Dyersburg Fabrics Co., Inc.***, 567 S.W.2d 169, 170 (Tenn. 1978).

***Wells***, 9 S.W.3d at 783. Based on the testimony, exhibit, and in view of the trial court's credibility finding, the evidence does not preponderate against the trial court's finding that Father was not in contempt of the parenting plan on the subject of the child's religious upbringing.

## V. Change of Residential Parent

Turning to the remaining issue concerning the trial court's denial of Mother's motion to modify the permanent parenting plan to designate her as the child's primary residential parent, we first note that Mother's request to change the child's primary residential parent constitutes a request to modify child custody. *See* ***Burnett v. Burnett***, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015) (explaining that "[i]f a parent requests a modification of custody" that is "also known as a change in the primary residential parent"). When considering a motion to modify child custody, the threshold question a court must answer is whether there has been a material change in circumstances since the entry of the existing parenting plan. *See* ***C.W.H. v. L.A.S.***, 538 S.W.3d 488, 496 (Tenn. 2017). The party seeking to modify the existing parenting plan bears the burden to prove this material change by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(B). If a court finds there has been a material change in circumstances, then it must decide whether modification of the parenting plan is in the child's best interest. If the court finds that there has been no material change in circumstances, it "is not required to make a best interest[ ] determination and must deny the request for a change of custody." ***Pippin v. Pippin***, 277 S.W.3d 398, 405 (Tenn. Ct. App. 2008) (quoting ***Caudill v. Foley***, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999)). Mother argues the trial court erred in finding that she failed to carry her burden to establish a material change in circumstances.

Turning to the question of a material change in circumstances, we first note that courts are generally reluctant to change initial custody determinations unless it is clear that modification is necessary. ***Canada v. Canada***, No. W2014-02005-COA-R3-CV, 2015 WL 5178839, at *4 (Tenn. Ct. App. Sept. 4, 2015); *see* ***Curtis v. Hill***, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006) ("Because children are more likely to thrive in a stable environment, the courts favor existing custody arrangements."). Although "[t]here is no 'bright line' test for determining whether a material change of circumstances has occurred," ***Canzoneri v. Burns***, No. M2020-01109-COA-R3-CV, 2021 WL 3399860, at *6 (Tenn. Ct. App. Aug. 4, 2021) (citing ***McClain v. McClain***, 539 S.W.3d 170, 188 (Tenn. Ct. App. 2017)), courts

are guided by statutory and case law. Tennessee Code Annotated section 36-6-101(a)(2)(B) provides that a material change in circumstances "may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). Reviewing courts should also consider the following principles when determining whether there has been a material change in circumstances:

> First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. Fourth, the change in circumstances must affect the child's well-being in some material way.

*Canzoneri*, 2021 WL 3399860, at *6 (citing *McClain*, 539 S.W.3d at 188). Whether a material change in circumstances has occurred is a factual question and one that appellate courts presume the trial court correctly determined unless evidence in the record preponderates otherwise. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (internal citations omitted); *see also* Tenn. R. App. P. 13(d).

Turning to the record, at the hearing, Mother asserted a material change in circumstances based on allegations that: (1) the child was being schooled by Father's girlfriend; (2) the child was spending the night at Father's girlfriend's home. As the trial court explained from the bench:

> [B]ased upon the testimony I've heard, the only real issue that the mother has raised [as to] why she should . . . get a complete change of custody, is the fact that the father removed the child from preschool and the child now stays during the day with his fiancée who he admitted works and is a student and has two other children . . . . I do not find that that arises to the level of a substantial material change of circumstances to justify changing the parenting schedule. It's not what the mother would like, but in order to change a parenting plan, I have to adhere to the law and find a material change of circumstances. So I'm going to dismiss the petition for change of custody that Ms. McCurry has filed.

Mother's own testimony supports the trial court's finding that there was no material change of circumstances to warrant a modification of the child's primary residential parent, to-wit:

- 15 -

Q. Have there been any material changes since that date [i.e., August 17, 2020, the date the trial court denied Mother's June 19, 2020 petition to be named the child's primary residential parent]?

A. Since that date, no, because the judge just ruled—from the order that the judge listed in 2020 he said moving forward we have to obey the parenting plan, so there hasn't been any to my knowledge. I didn't come back here after that.

There is no evidence that Isaiah's well-being has been negatively affected either by Father's relationship with Ms. Wray, or by his removal from pre-school. Father testified, "We're [i.e., Father and Ms. Wray] going to get married in July so we're trying to acclimate [Isaiah] to a new setting slowly." From the record, Father and Ms. Wray have taken steps to ease Isaiah's integration with his step-siblings and step-mother so that Father's re-marriage will not be major upheaval in the child's life. So, although Father and Ms. Wray's marriage will be a change for Isaiah, Father is clearly concerned with Isaiah's well-being, stability, and happiness surrounding this change. Furthermore, Father has been the child's primary residential parent since he was less than two years old, and there is no evidence that Father has provided anything less than a stable and loving home. The fact of Father's relationship with Ms. Wray, and Father's decision to remove Isaiah from his pre-school placement simply do not constitute material changes in circumstances sufficient to warrant a change in the child's primary residential parent, and we affirm the trial court's denial of Mother's petition.

## VI. Frivolous Appeal

As a final matter, we address Father's request for damages from defending a frivolous appeal pursuant to Tennessee Code Annotated § 27-1-122, which states:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

"The decision whether to award damages for a frivolous appeal rests solely in our discretion." *Kramer v. Kramer*, No. E2018-00736-COA-R3-CV, 2019 WL 1239867, at *5 (Tenn. Ct. App. Mar. 18, 2019) (citing *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009)). "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that it can ever succeed." *Indus. Dev. Bd. of City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995) (citations omitted). Based on our review of the record and in the exercise of our discretion, we decline to award damages for a frivolous appeal.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's order. Appellee's motion for appellate attorney's fees and costs is denied, and the case is remanded to the trial court for such further proceedings as may be necessary and are consistent with the opinion. Costs of the appeal are assessed to the Appellant, Agness McCurry. Because Appellant is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

<u>s/ Kenny Armstrong</u>
KENNY ARMSTRONG, JUDGE